In the Matter of the Ancillary Liquidation of Midland Insurance Company, a Corporation Organized and Existing Under the Laws of the State of New York and Licensed to do Business in the State of Wisconsin:

Kenneth BELONGIA, Appellant,

v.

Wisconsin Insurance Security Fund, and Northbrook Property & Casualty Company, Respondents.

Court of Appeals

No. 93–2622. *Submitted on briefs June 8, 1994.—Decided July 13, 1995.*

(Also reported in 537 N.W.2d 51.)

For the appellant, Kenneth Belongia, the cause was submitted on the brief of *Walter W. Stern* of Union Grove.

For the respondent, Wisconsin Insurance Security Fund, the cause was submitted on the brief of *Jeffrey J. Kassel* and *Teresa M. Elguezabal* of *La Follette & Sinykin* of Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

GARTZKE, P.J. Kenneth Belongia appeals from a circuit court order affirming the decision of the Wisconsin Insurance Security Fund dismissing his claim against the fund. Belongia filed his claim against the fund because the liability insurer for the party whose negligence injured him in a motor vehicle accident was insolvent and undergoing liquidation. The fund's hearing examiner dismissed Belongia's claim because his damages are less than the amount available to him from other insurance coverage. We affirm the circuit court's order.

1. Background and Issues

Belongia, a truck driver, was injured when a truck hit his parked truck. The liability insurer of the adverse driver was insolvent. Belongia therefore filed a claim against the Wisconsin Insurance Security Fund.

The fund is created by and administered under ch. 646, STATS. The purpose of ch. 646 "is to protect insureds from losses occasioned by the insolvency of their insurance company." *Fireman's Fund Ins. Co. v. Pitco Frialator Co.*, 145 Wis. 2d 526, 532, 427 N.W.2d 417, 420 (Ct. App. 1988). More precisely, one purpose of ch. 646 is to "maintain public confidence in the promises of insurers by providing a mechanism for protecting insureds from excessive delay and loss in the event of liquidation of insurers . . . ." Section 646.01(2)(a), STATS.

The fund consists of payments by insurers through assessments made under § 646.51, STATS., earnings from investments, and amounts the fund recovers upon liquidation of insurers. Section 646.11(1), STATS. The board of directors of the fund stands in the position of the insurer in the payment of claims filed by insureds against the fund. Section 646.13(1)(b), STATS.

██

To be eligible for payment from the fund, the claimant must show that he or she has an unpaid claim for a loss insured under a policy and that the terms, conditions and limitations of § 646.31, STATS., are met. One such limitation is set forth in § 646.31(6), appropriately entitled "Collection from Collateral Sources." Section 646.31(6)(a) provides in pertinent part: "The portion of a loss claim for which indemnification is provided by other benefits or advantages, which may not be included in the class of claims defined by s. 645.68(3), may not be claimed from the fund under this chapter."

Under § 646.31(6)(a), STATS., a claimant cannot claim that "portion of a loss claim for which indemnification is provided by other benefits or advantages . . . ." The fund's hearing examiner found that Belongia's damages resulting from his injuries, exclusive of medi-

cal bills, amounted to $11,641.06 in lost wages and $20,000 for pain, suffering and disability, totalling $31,641.06.[1] The examiner also found that the portion of Belongia's claim for which indemnification is provided by other insurance totals $43,987.59, $30,000 in uninsured motorist coverage plus $13,987.59 in worker's compensation benefits. Because Belongia's damages minus a $200 deductible under § 646.31(3) are less than the $43,987.59 available from the collateral sources, the examiner dismissed Belongia's claim against the fund.

Belongia asserts: (1) the examiner lacked jurisdiction and the circuit court lacked competence to review the examiner's determination because a claims supervisor initially erred when denying the claim, (2) his damages for his permanent injury and his pain, suffering and disability, past and future, exceed the $20,000 set by the examiner, (3) the examiner erred by taking into account the $30,000 coverage available under his employer's uninsured motorist policy when, as a matter of fact, he and the insurer settled his uninsured motorist claim in good faith for $17,500, and (4) the examiner erred by taking into account a $5,940 lump-sum payment to him under a worker's compensation compromise agreement.

We resolve the issues Belongia raises against him.

2. Jurisdiction

The fund's claims supervisor made an erroneous initial determination that § 646.31(6)(a), STATS., requires that a claimant exhaust all collateral sources before seeking recovery from the fund. Because

---

[1] The examiner incorrectly computed the total as $36,641.06. We use the correct total in our opinion.

Belongia settled his uninsured-motorist claim for $17,500, even though a $30,000 policy limit existed, the claims supervisor denied Belongia's claim against the fund.

The fund concedes that the initial determination was incorrect. Section 646.31(6)(a), STATS., offsets from the fund's liability the amount of indemnification provided by collateral sources, regardless whether the claimant has pursued those other sources. The statute does not require that a claimant *exhaust* collateral sources before claiming from the fund.

We reject Belongia's assertion that the initial determination somehow deprived the hearing examiner of jurisdiction and the circuit court of competency. A statutory appeal procedure is in place to cure errors. Belongia, a claimant whose claim had been declared ineligible, exercised his right under § 646.32(1), STATS., to appeal to the board of directors of the fund within thirty days after notice of the initial determination was mailed to him. An evidentiary hearing was held before an examiner, and the erroneous basis for the initial determination was cured, even though the examiner ultimately dismissed Belongia's claim. Belongia timely petitioned for review to the circuit court under § 227.52, STATS. That court was competent to proceed under § 227.53, STATS.

### 3. Damages

Belongia disputes the examiner's finding that his damages are $20,000 for his permanent injury and his pain, suffering and disability, past and future. He asserts that the award is too low and not supported by substantial evidence.

843

An award for past and future pain, suffering and disability is a discretionary decision by the fact finder.

> We have said many times that an award of damages for pain, suffering and disability must find its basis on the credible evidence but that the amount of the award is a matter resting largely in the discretion of the jury. This is because damages of this kind cannot be calculated with any substantial degree of mathematical certainty.

*Davis v. Allstate Ins. Co.*, 55 Wis. 2d 56, 58, 197 N.W.2d 734, 735-36 (1972). The legislature has prohibited us from substituting our judgment for that of the agency "on an issue of discretion." Section 227.57(8), STATS. Our review of an agency's discretionary decision is therefore deferential. We look no further than to determine whether the agency examined the relevant facts, applied a proper standard of law, and reached a reasonable conclusion. *Doersching v. Funeral Directors*, 138 Wis. 2d 312, 328, 405 N.W.2d 781, 788 (Ct. App. 1987).

The hearing examiner considered Belongia's injury and complaints. He noted that Belongia claims: (1) a permanent injury to his right hand, including numbness and tingling, unabated by carpel tunnel release surgery, (2) the pain wakes him at night, (3) he has difficulty using his hand and drops things, and (4) he has other complaints. The examiner also noted that he observed Belongia lean all of his weight on a cane which he held in his right hand in the area that was the primary source of his complaint. The examiner found that no credible medical or other evidence exists that the injury caused a permanent impairment to Belongia's ability to work as a trucker. The examiner found that while Belongia receives social security for

total disability, the primary reason is a prior left-knee injury.

Belongia contends that because the examiner offered no specific analysis as to the appropriateness of the $20,000 award, we should reverse and direct him to do so. However, Belongia himself has not suggested a specific award, much less a specific analysis for calculating it. The examiner considered the facts. Articulation of specific reasons for a specific money award for pain and suffering is well-nigh impossible. The $20,000 award is reasonable, and we affirm it.

4. Uninsured Motorist Insurance Offset

Belongia's employer's uninsured-motorist policy provides $30,000 coverage. Belongia settled his claim on that policy for $17,500.[2] The examiner concluded that Belongia's damages must exceed $44,187.59 to proceed against the fund for additional payments. The examiner arrived at this amount by adding the policy limit ($30,000), Belongia's worker's compensation benefits exclusive of medical payments made on his behalf ($13,987.59),[3] and the deductible under § 646.31(3), STATS. ($200). Having found that Belongia's total damages, exclusive of medical bills, amounted to $31,641.06, the examiner dismissed Belongia's claim.

The propriety of the examiner's ruling turns on that part of § 646.31(6)(a), STATS., which provides in effect that the portion of a loss claim "for which indemnification is provided by other benefits or advantages,"

---

[2] The examiner found that Belongia and the insurer negotiated the settlement in good faith.

[3] This amount includes the $5,940 lump-sum payment which we discuss later in the opinion.

may not be claimed from the fund. The question is whether the statute means, as Belongia asserts, that recovery from the fund is prohibited only for that portion of his loss claim for which indemnification was actually recovered from other sources, or, as the fund asserts, the prohibition applies to the amount of indemnification "provided" by other sources, regardless of the amount actually collected from those sources.

The meaning of a statute is a question of law. An agency's interpretation does not bind the courts. However, the courts frequently refrain from substituting their interpretation of a statute for that of the agency charged with administering the statute.

> Courts will give varying degrees of deference to an agency's interpretation of a statute when they have concluded that the legislature charged the agency with the duty of administering the statute; that the agency's interpretation is of longstanding; that the agency's interpretation entails its expertise, technical competence and specialized knowledge; and that through interpretation and application of the statute, the agency can provide uniformity and consistency in the field of its specialized knowledge.

*Lisney v. LIRC*, 171 Wis. 2d 499, 505, 493 N.W.2d 14, 16 (1992). A court will not defer when the agency's interpretation contravenes the words of the statute, is contrary to the legislative intent, or is otherwise unreasonable. *Id*. at 506, 493 N.W.2d at 16.

The fund does not assert that it has prior experience with the issue before us, or that its interpretation entails its expertise, or that its specialized knowledge will provide uniformity and consistency in the applica-

846

tion of the statute. We conclude that our review is de novo, and we will not defer to the fund's interpretation of § 646.31(6)(a), STATS.

We are satisfied that the fund correctly interprets the statute. We note first that § 646.31(6)(a), STATS., prohibits claims against the fund for the amount of indemnification "provided" by other sources. It makes no reference to the amounts "collected" or "recovered" from other sources.

Second, by specifically referring to § 645.68(3), STATS., § 646.31(6)(a), STATS., incorporates the "class of claims defined by s. 645.68(3)" into the description of the portion of the loss that may not be claimed from the fund. We therefore look to § 645.68(3) to determine whether it contains anything contradictory to our reading and the fund's reading of § 646.31(6)(a). We find no contradiction. Indeed, § 645.68(3) excludes from the class of loss claims payable in a liquidation that "portion of any loss for which indemnification is provided by other benefits or advantages *recovered or recoverable* by the claimant . . . ." (Emphasis added.) Thus, if other benefits are recoverable by the claimant, regardless whether they are actually recovered, the claim is reduced by that amount.

Finally, § 646.31(6)(c), STATS., provides:

> Any person having an eligible claim which also constitutes a claim or legal right of recovery under any governmental insurance or guaranty program shall first exhaust all rights under that program, and any amount payable on an eligible claim under this chapter shall be reduced by the amount of *recovery* under that program.

847

(Emphasis added.) Section 646.31(6)(c) shows that when the legislature intends to reduce the amount payable on a claim against the fund "by the amount of recovery," it has said so.

Belongia relies on a Michigan decision, *Watts v. Michigan Dept. of State M.V.A.C.F.*, 231 N.W.2d 43 (Mich. 1975), under that state's Motor Vehicle Accident Claims Fund. The Michigan Supreme Court dealt with a provision in its statute that no payment be made out of the fund in respect to a claim for damages of "any amount paid or payable by an insurer by reason of the existence of a policy of insurance." *Id.* at 44. The court held that the fund was entitled to credit only for the amount actually "paid" by an insurer rather than the policy limit. *Id.* at 45. Section 646.31(6)(a), STATS., does not use the phrase "paid or payable." Because of the difference between the Michigan statute and § 646.31(6)(a), *Watts* is inapplicable to the case before us.

Moreover, other jurisdictions have explained why the Michigan rule can lead to undesirable results. In *Hetzel v. Clarkin*, 772 P.2d 800, 805 (Kan. 1989), the Kansas Supreme Court rejected the Michigan approach because it "may lead to collusive settlements between the injured plaintiff and the plaintiff's uninsured motorist insurer. It may also lead to excessive litigation on the issue of whether such settlements were made in good faith." The Colorado Supreme Court rejected the Michigan approach for essentially the same reasons and added that it "may result in the [fund's] subsidizing the uninsured motorist insurer" by requiring that the fund pay the difference between the settlement amount and the policy limit. *Colorado Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139, 1143 n.3 (Colo. 1992). *See also Prutzman v. Armstrong*, 579 P.2d 359,

362 (Wash. 1978) (offsetting actual recovery would furnish no incentive for plaintiffs to seek adequate settlement from their own insurers, because they could force the fund to pay the difference between the settlement and the actual value of the claim).

We conclude that the hearing examiner properly interpreted and applied § 646.31(6)(a), STATS., when offsetting against Belongia's claim the $30,000 uninsured motorist coverage available to him for the accident rather than the $17,500 he settled for under the policy.

### 5. Worker's Compensation Settlement

Belongia entered a worker's compensation compromise agreement for a lump-sum payment of $5,940, with additional payments totaling $727 to be made to three health care providers. The hearing examiner found that the $5,940 was in consideration of temporary total disability and permanent partial disability. The examiner determined that § 646.31(6)(a), STATS., requires that the $5,940 lump-sum payment, but not the $727 paid to the health care providers, must be offset against Belongia's claim against the fund. Belongia asserts that the $5,940 payment should not be offset, because some of that amount was for medical expenses.

The record, however, contains no evidence that any part of the lump-sum payment to Belongia went to doctors or that he personally paid any of his medical expenses. The hearing examiner found that the worker's compensation carrier paid all of Belongia's medical expenses, that the total payment made by the carrier for indemnity and medical expenses is

849

$19,766.20, and that there is no evidence that any health care bills remain unpaid.

Belongia contends that § 102.16(1), STATS., which authorizes submission of proposed worker's compensation compromises for approval by DILHR, does not require division of the compromise into future medical or past medical expenses or temporary total or partial permanent disability. But it does not follow that some or all of the $5,940 in fact went to pay medical bills. The entire lump-sum payment must be treated as a collateral source, and therefore it may not be claimed from the fund under ch. 646, STATS.

We conclude that we must affirm the order of the circuit court affirming the decision of the hearing examiner for the Wisconsin Insurance Security Fund dismissing Belongia's claim against the fund.

*By the Court.*—Order affirmed.

SUNDBY, J. (*dissenting*). In this case, we interpret provisions of the Wisconsin Insurance Security Fund Law, ch. 646, STATS. The purpose of the law is to protect an insured from excessive loss when its insurer is liquidated. Section 646.01(2)(a), STATS. The law creates an "insurance security fund" consisting of contributions from all insurers subject to ch. 646. Section 646.11(1), STATS. An insured whose insurer is in liquidation may file a claim against the fund if it is an unpaid claim for a loss insured under the insured's policy, and all of the statutory conditions are met. Section 646.31(1), STATS. The issue on appeal is whether when the insured collects part of its loss from another policy, its claim against the fund must be reduced by

the amount the insured recovers or by the amount of the policy limits.

Wisconsin was one of the first states to enact an insurance security fund law. Laws of 1979, ch. 109, Preliminary Note. Wisconsin's Insurance Security Fund Law preceded development of the model act under the auspices of the National Association of Insurance Commissioners (NAIC). *Id.* However, the repeal and re-creation of Wisconsin's Security Fund Law in 1979 drew heavily on NAIC's Post-Assessment Property and Liability Insurance Guaranty Association Model Act. *See* Laws of 1979, ch. 109, § 14, Introductory Note.

NAIC's Model Act suggests an "exhaustion" requirement intended to insure that an insured will not recover twice—once from the collateral source and once from the fund. Post-Assessment Property and Liability Insurance Guaranty Association Model Act, NAIC Model Laws, Regulations and Guidelines § 12A (1995). Before a person having a claim against an insurer may recover from the fund, he or she must "exhaust" his or her right under any "collateral" policy.

The Model Act does not describe how an insured "exhaust[s]" his or her rights under the "collateral" policy. However, the majority of the courts which have addressed the exhaustion requirement have concluded that the insured is not required to litigate the insured's right to recover the policy limits of a "collateral" policy; a settlement negotiated in good faith satisfies the exhaustion requirement.

Chapter 646, Stats., does not impose an exhaustion requirement on an insured who makes a claim against the fund, but insures nonduplication of recovery by requiring that if the insured collects a portion of a loss claim from collateral sources, the amount col-

lected may not be claimed from the fund. Section 646.31(6)(a), STATS., provides:

COLLECTION FROM COLLATERAL SOURCES. The portion of a loss claim for which indemnification is provided by other benefits or advantages, which may not be included in the class of claims defined by s. 645.68(3), may not be claimed from the fund under this chapter.

The Wisconsin Insurance Security Fund argues that there must be deducted from a claim against the fund the policy limits of the "collateral" policy; not the amount recovered. I disagree. I conclude that a claim against the fund must be reduced only by the amount recovered from the collateral source, provided that amount is determined in good faith.

In *Fireman's Fund Insurance Co. v. Pitco Frialator Co.*, 145 Wis. 2d 526, 532, 427 N.W.2d 417, 420 (Ct. App. 1988), we said:

We reiterate that the clear and unambiguous purpose of ch. 646 is to protect insureds from losses occasioned by the insolvency of their insurance company. . . . [T]he Wisconsin Insurance Security Fund law is a remedial statute which must be construed to give effect to its leading idea and must be brought into harmony with its purpose.

This purpose is undercut if the insured whose insurer has become insolvent must have his or her claim reduced by the policy limits of a collateral insurance policy source, even if, realistically, such recovery is not possible except through litigation.

Section 646.31(6)(a), STATS., provides: "COLLECTION FROM COLLATERAL SOURCES. The portion of a loss claim for which indemnification is provided by other benefits or advantages, which may not be

included in the class of claims defined by s. 645.68(3), may not be claimed from the fund under this chapter."

The majority considers the title to § 646.31(6), STATS., "appropriate[ ]." Maj. op. at 841. "Collect" means "to gather in or together, *to collect taxes* . . . ." THE NEW LEXICON WEBSTER'S ENCYCLOPEDIC DICTIONARY 192 (1991). Belongia "collected" $17,500 from his uninsured motorist coverage, not $30,000, the policy limits.

The majority relies on the "recovered or recoverable" language of § 645.68(3), STATS. It assumes that the policy limits of the collateral source are "recoverable." However, we do not know without a trial how much of the policy limits of Belongia's uninsured motorist coverage is "recoverable." It is unreasonable to force Belongia to litigate this issue solely to determine his claim against the fund.

The courts which have construed their state's insurance security fund laws have uniformly required that a claimant "exhaust" his or her rights to recover whatever is available under his or her own insurance policies before making a claim against the fund. However, they differ as to the effect of that "exhaustion" upon the parties' claim against the state's insurance security fund. The Michigan Supreme Court holds that where the insured negotiates a settlement in good faith, only the settlement is deducted from the insured's claim, regardless of the policy limits. *Watts v. Michigan Dep't of St., Motor Vehicle Accident Claims Fund*, 231 N.W.2d 43, 45 (Mich. 1975). The court said that the fund's remedy for collusive settlements was to attack those settlements by affirmatively showing collusion or some other species of fraud. *Id.*[1]

---

[1] *See Colorado Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139, 1142 (Colo. 1992) (the recovery the court allowed against the insurance fund was the difference between the policy limits of

In Wisconsin, there is no need to fear collusive settlements. Section 646.13(2), STATS., which prescribes the special duties and powers of the board of directors of Wisconsin's Insurance Security Fund provides: "The board may: (a) Review settlements, releases and judgments to which the insurer or its insureds were parties to determine the extent to which they may be properly contested." Thus, the board may review and determine the bona fides of any settlement. This authority is meaningless unless it applies to a collateral source settlement. There would be no incentive for the insured to negotiate a settlement with the collateral source insurer if his or her claim against the fund would always be reduced by the policy limits. I believe that limiting the deduction from the insured's claim against the fund to the amount actually recovered from the collateral insurance policy source is most faithful to the purposes of the Wisconsin Insurance Security Fund. Accordingly, I dissent.

---

the uninsured motorist coverage and the fund's statutory limits); *Hetzel v. Clarkin*, 772 P.2d 800, 802 (Kan. 1989) ("Any amount payable on a covered claim under this act shall be reduced by the amount of *any recovery* under such insurance policy." (emphasis added)); *Richard v. Johnson*, 234 N.W.2d 22, 25 (N.D. 1975) (it is the general policy of the law to encourage good-faith settlements).