OPINION OF THE COURT
Beverly S. Cohen, J.
Claimant Lac d’Amiante du Quebec, Ltee. (LAQ) seeks a determination whether the excess umbrella liability insurance policy issued by Midland Insurance Company (Midland) to LAQ’s parent corporation ASARCO Incorporated (ASARCO) for the period April 29, 1975 to March 15, 1976 provides coverage for any asbestos bodily injury claims asserted against LAQ alleging first exposure to asbestos in or before the policy period.
Until its operations ceased in 1986, LAQ, a Delaware corporation doing business in Quebec, Canada, was engaged in the mining, milling and selling of asbestos fiber. Since 1954, LAQ was covered under liability insurance policies purchased by its parent ASARCO, which coverage included protection against products liability hazards. Over the years, LAQ’s coverage was provided by many, often overlapping and layered insurance policies.
During the period relevant to the present inquiry, April 29, 1975 to March 15, 1976, LAQ was insured under (1) a liability insurance policy issued by Canadian General Insurance Company with an annual aggregate limit of $300,000 for the product hazard; (2) an umbrella liability insurance policy issued by American Home Assurance Company (AHAC) having an annual aggregate limit of $3,000,000 (the AHAC policy); and (3) an excess liability policy issued by Midland having an annual aggregate limit for the product hazard of $20,000,000 in excess of AHAC’s 1975-1976 policy (the Midland policy).
Like numerous other companies involved in the manufacture and selling of asbestos products, LAQ has been subjected to a profusion of claims alleging serious personal injury resulting from the often prolonged exposure to and inhalation of asbestos fibers. In 1983, LAQ commenced an action against AHAC, Highlands and Midland in the United States District Court for the District of New Jersey for damages and a declaration as to the trigger and scope of coverage under the *365 various policies for the asbestos-related claims. The District Court proceeded to determine the issues as to all three insurers, resulting in the decision Lac D’Amiante Du Quebec v American Home Assur. Co. (613 F Supp 1549 [D NJ 1985]) (LAQ 1), despite the fact that Midland had been placed in liquidation by the Supreme Court, New York County, by order dated April 3, 1986, prior to the entry of judgment in LAQ 1.
The Superintendent of Insurance was unsuccessful in his motion for dismissal of the LAQ 1 action as to Midland based on the pending liquidation proceedings and on April 2, 1987, the District Court issued a judgment in LAQ’s favor, which included judgment against Midland in excess of $6 million. All three insurers appealed, although Highlands and AHAC settled with LAQ while the appeal was still pending.
On December 28, 1988, the United States Court of Appeals, Third Circuit, vacated the judgment against Midland so as to avoid disruption of the State liquidation proceeding (Lac D’Amiante du Quebec v American Home Assur. Co., 864 F2d 1033, 1046-1047). The matter was remanded to the District Court, where the action was dismissed by order dated February 16, 1989.
LAQ now brings its claim in the context of the liquidation proceeding before this court. In their stipulation of facts, the parties agreed that they are seeking a declaration concerning only the interpretation and application of the relevant policy provisions governing the "trigger” and scope of coverage under Midland’s 1975-1976 policy with respect to indemnification of LAQ for amounts paid in settlement of claims for bodily injury resulting from exposure to asbestos.
The specific issue to be resolved is: What factor(s) occurring or existing during the Midland policy period will be deemed sufficient to "trigger” coverage of asbestos-related bodily injuries under Midland’s 1975-1976 policy?
The stipulation of facts also adopted a description of the asbestos-related diseases of asbestosis and mesothelioma contained in Borel v Fibreboard Paper Prods. Corp. (493 F2d 1076 [5th Cir 1973], cert denied 419 US 869 [1974]), and contained the parties’ understanding that the various asbestos-related conditions "result after inhalation of asbestos fibers”, and from a "process” of cellular and/or tissue changes "that begins shortly after inhalation of asbestos fiber and continues to progress undetected even if no additional asbestos fibers are inhaled.” The parties’ stipulation further concluded that *366 "[tjhere exist at present no medical techniques capable of specifically identifying and quantifying the amount of progression of asbestos-related injury, sickness or disease actually sustained in each year from and after a first exposure to asbestos fiber.”
Coverage under the Midland policy is triggered by "accidents or occurrences happening between the effective and expiration dates” of the policy. The AHAC policy similarly states that claims will be covered which are "caused by or arising out of an occurrence,” and that the policy applies, "only to occurrences happening anywhere during the policy period.”
The Midland policy does not contain any definition of "accidents or occurrences,” but contains standard "form-following” language which states that, "[ejxcept as may be inconsistent with this policy, the coverage provided by this policy shall follow the insuring agreements, conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by this policy, including any change by endorsements.”
The parties agree that it is the language of the AHAC policy concerning the trigger of coverage which applies.
"Occurrence” in the AHAC policy "[wjith respect to Personal Injury * * * means an event, including continuous or repeated exposure to conditions which result in Personal Injury or property damage neither expected nor intended from the standpoint of the insured.”
The paragraph continues, "[ajll such exposure to substantially the same general conditions shall be deemed one occurrence”.
"Personal Injury” under the AHAC policy is defined, as relevant to the present inquiry, as "bodily injury, sickness, disease, disability, shock, fright, mental anguish and mental injury.”
In LAQ 1, the parties stipulated, for purposes of the motions and cross motions arguing the trigger issue, that the "operative provisions” of all of the insurance policies were the same, and that the relevant provisions in the AHAC policies, by which each excess form-following policy was to be governed, "do not differ in any significant respect from those in the standard Comprehensive General Liability policies widely *367 used in the insurance industry” (Lac DAmiante Du Quebec v American Home Assur. Co., supra, 613 F Supp, at 1552).
For purposes of LAQ 1, the term "occurrences” was defined as in a standard comprehensive general liability policy, as:
"an event, including continuous or repeated exposure to conditions, which result in Personal Injury or Property Damage during the policy period . . .
" 'Personal Injury’ is defined as:
"bodily injury, sickness, disease including death anytime resulting therefrom . . . which occurs during the policy period.” (613 F Supp, supra, at 1553.)
The more or less standard language employed by the insurance industry in comprehensive general liability (CGL) policies since the mid-1960’s is the result of considerable discussion concerning the need to encompass within the policies coverage for injuries caused by insidious disease process, such as asbestos-related illnesses, which could not easily be encompassed in the word "accident” formerly in use. Despite industry attempts to arrive at a clear standard in postreform 1966 CGL policies, a judicial storm currently rages over the State and Federal jurisdictions as to what event triggers coverage of claims arising from long-term exposure to asbestos which results in injury over a long period of time.
Although there is consensus that the trigger is "bodily injury” occurring during the policy period, that is, when injury or illness is actually "proved to have existed during coverage” (American Home Prods. Corp. v Liberty Mut. Ins. Co., 565 F Supp 1485, 1497, affd as mod 748 F2d 760), there is dispute over when that point has been reached in asbestos-related or other exposure-related illnesses. The LAQ 1 court adopted the "continuous trigger” espoused in Keene Corp. v Insurance Co. (667 F2d 1034 [DC Cir 1981], cert denied 455 US 1007), which defines "bodily injury” as "occurring” during "any part of the single injurious process that asbestos-related diseases entail” (supra, at 1047). In this broadest of interpretations all insurance policies in existence from the claimant’s initial exposure to asbestos, throughout the time in which the disease develops as a result of the "exposure-in-residence” of asbestos fibers in the lungs, regardless of whether exposure continues through to the manifestation of the disease and up to death, will be triggered, obligating numerous insurers, providing coverage over decades of time, to cover the loss (see *368 also, ACandS, Inc. v Aetna Cas. & Sur. Co., 576 F Supp 936 [ED Pa 1983], affd in part, vacated in part 764 F2d 968).[1]
LAQ urges this court to adopt the contiguous trigger approach arguing any other interpretation is at odds with the policy’s plain meaning, the insurance industry’s deliberate efforts to develop standard "occurrence-based liability coverage in progressive injury cases” and the "vast weight of case authority.” LAQ insists that the "form following” language in the Midland policy requires this court to apply the interpretation used by the LAQ 1 court to the same policies, despite the vacatur of that decision as to Midland, and the settlement of the action as to the remaining defendants.
The court rejects LAQ’s attempts to impose the LAQ 1 court’s interpretation of the AHAC and Midland policies upon Midland in the present proceeding based on the form-following language. That vacated decision has no collateral estoppel or res judicata effect on Midland. Nor has judicial estoppel of any kind been alleged or proved.
The form-following provision in Midland’s policy requires adherence to the "insuring agreements * * * of the underlying insurance”, that is, the actual language of the AHAC policy. LAQ has provided no authority for its novel argument that this form-following clause was intended to contractually bind Midland, as well as this court, to the judicial interpretation given to the AHAC policy by another court in a related, but wholly noncontrolling decision. In the context of this *369 proceeding, it is this court’s interpretation of the AHAC insuring agreements which will determine the terms to which Midland is bound.
The United States Court of Appeals in vacating LAQ 1 (supra) as to Midland anticipated that a State court might arrive at a different interpretation of the "occurrence” language than did the LAQ 1 court (Lac D Andante du Quebec v American Home Assur. Co., supra, 864 F2d, at 1046). This must necessarily be so because the relevant language of the AHAC policy is not the same as the CGL policy’s language adopted by the court and the parties in LAQ 1. Consequently, this case does not present the court with the obligation to join the debate over the meaning of "occurrences” in standard CGL policies unless it is shown that the language of the AHAC policy is comparable to that employed in today’s CGL policies.
LAQ has expended considerable effort to prove that no significant differences exist between the AHAC "occurrence” language and the standard CGL language, and insists that the AHAC policy, despite its actual language, was intended to reflect the charges incorporated into CGL policies in 1966 by the industry in its campaign to end the confusion concerning the trigger of coverage in gradually occurring losses, confusion stemming, allegedly, from the standard use of the word "accident” in the definition of occurrence. LAQ provides as evidence documents prepared by the drafters of the 1966 reforms to show that it was the drafters’ intention to allow for the triggering of multiple insurance policies, covering large expanses of time where cumulative injury has resulted from the prolonged exposure to dangerous substances, which could not occur where the "occurrence” covered was defined as an "accident” or a single, finite "event”.
LAQ’s argument to this effect is somewhat disingenuous, considering that LAQ’s attorney has admitted that the AHAC policy was actually "in a format that’s sometimes called in the industry the pre-'66 or the pre-reform format.” In other words, LAQ recognizes that the AHAC policy does not contain the reformed language which has been the subject of so much scrutiny in the courts. Realizing this difficulty, LAQ argues that the exact language of the policy does not matter, since it is the intention of the industry that all the various "occurrence” language, whether it appears to focus on "event” or "injury”, is to be interpreted so as to afford the broad coverage *370 for gradually occurring losses which was, allegedly, the goal of the 1966 reforms.
The AHAC policy must be interpreted under New York law,[2] with the object of effectuating the intent of the parties (Breed v Insurance Co., 46 NY2d 351, 355; American Express Bank v Uniroyal, Inc., 164 AD2d 275, lv denied 77 NY2d 807). Contracts are to be read according to their plain meaning. Although ambiguities in contracts (and especially insurance contracts) will be construed against the drafter (Breed v Insurance Co., supra, at 353), the court should not invent ambiguities where none exist (Moshiko, Inc. v Seiger & Smith, 137 AD2d 170, 175-176, affd 72 NY2d 945). The court "may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation” (Breed v Insurance Co., supra, at 355).
This court cannot agree with LAQ’s conclusion that the AHAC policy language is interchangeable with the standard postreform CGL policy language, either in form or meaning. No reading of the AHAC policy language can lead to the conclusion that coverage is to be triggered by "bodily injury during the policy period,” as in the numerous CGL policy cases cited by LAQ. The AHAC policy requires the "happening” of an "occurrence” during the policy period. The "thing that is to happen” during the policy period is, "an event, including continuous or repeated exposure to conditions which result in Personal Injury.” Thus, according to the policy’s plain meaning, it is the event, or the "continuous or repeated exposure to conditions” which must occur during the policy period. If there is any ambiguity in this language, it is as to whether only the event (or continuous exposure) need happen during the policy period, or whether both exposure and injury need be present during the policy period, a distinction irrelevant in the present matter, since the parties have stipulated that injury in asbestos cases begins shortly after inhalation, making exposure and injury contemporaneous. No ambiguity exists, however, as to the need for "the event”, i.e., the "exposure” to "happen” during the policy period.
Hence, this court finds that the Midland policy is triggered by the claimant’s exposure to, and inhalation of asbestos (which, in this case, is tantamount to injury) during the policy period. This differs significantly from the triggering of "bodily *371 injury” during the policy period under the "continuous trigger” theory of LAQ 1 (613 F Supp 1549, supra), and Keene (667 F2d 1034), since the continuing progression of disease without continuing exposure to asbestos during the policy period will not trigger coverage under the AHAC policy, although it would under a standard CGL policy. Consequently, persons who were exposed to asbestos prior to the policy period as a result of LAQ’s activities, but whose exposure ceased prior to the Midland policy period will not be covered for their injuries by the Midland policy, although they would have been under the LAQ 1 court’s interpretation of the standard CGL policy language. Since bodily injury during the policy period alone is not a trigger for the Midland policy, the so-called " 'exposure in residence’ ” postulated in Keene Corp. v Insurance Co. (667 F2d, supra, at 1042) is not enough to trigger the Midland policy.[3]
Of the many cases cited by LAQ, the policy language involved almost uniformly requires there to be "bodily injury during the policy period”, whether that phrase appears in the definition of "occurrence”, but not in the definition of "bodily injury”, as in, for example, Keene Corp. v Insurance Co. (supra, at 1039);[4] in the definition of "bodily injury,” but not in the definition of "occurrence,” as in Commercial Union Ins. Co. v Sepco Corp. (765 F2d 1543, 1545); or which appears in both definitions, as in Insurance Co. v Forty-Eight Insulations (633 F2d, supra, at 1216). The court cannot help but notice that AHAC’s policies following the out-of-date "pre-reform format” 1975 policy here in dispute conform exactly to the standard CGL policy language adopted by the court in LAQ 1 (supra).
LAQ has not convinced this court that the presence of the "during the policy period” language outside of the definitions of "bodily injury” or "occurrence” is a trivial matter of *372 punctuation, since the entire meaning of the term "occurrence” is changed thereby. No cases cited by LAQ hold that a policy containing language comparable to that of the AHAC policy can, under the rules of English grammar, or under common principles of contract interpretation, be construed so as to make the "occurrence” the presence of injury, rather than the happening of the event, or exposure. The single case in which language at all comparable to the AHAC policy is addressed (Wisconsin Elec. Power Co. v California Union Ins. Co., 142 Wis 2d 673, 419 NW2d 255, review denied 142 Wis 2d 954, 419 NW2d 563) supports this court’s interpretation, because it is the continuing exposure to the harmful condition (stray voltage from electrical systems) which is the continuing "occurrence” that triggered all policies in effect while the exposure continued, not the continuation of the injury process (supra, at 258), although the Wisconsin Elec, court analogized the continuing exposure to the continuous bodily injury trigger in Keene (supra). Similarly, it is the exposure to asbestos during the policy period which triggers the AHAC policy in this case.
The cases and articles involving the language of the London Marine Market multiliability policies, to which LAQ refers this court, are not persuasive. These policies are so awkwardly drafted, with regard to the relevant language, that it is no wonder that ambiguity has been discerned[5] (see, Pittsburgh Corning Corp. v Travelers Indent. Co., No. 84-3985 [ED Pa, Jan. 20, 1988]; Brenner, The Trigger & Coverage Under the London Marine Definition of Occurrence: Is it the Event, the Happening or the Injury?, 11 Mealey’s Lit Rpts: Insurance, at 13 [Jan. 18, 1994]).
Coverage under Midland’s policy depends on the claimant having suffered exposure to asbestos during the policy period. The "one occurrence” language in the AHAC policy is generally construed as relating to the insureds’ limits of liability under the policy, and to the question of the preoccurrence deductible which the insured will be required to pay (see, Owens-Illinois, Inc. v Aetna Cas. & Sur. Co., 597 F Supp 1515, 1524-1528; Uniroyal, Inc. v Home Ins. Co., 707 F Supp 1368). The Superintendent has cited no authority for his argument that the "one occurrence” language has anything to do with the trigger of coverage issue at all.
*373 Further, the conclusion urged by Midland that only the initial inhalation of asbestos constitutes the "event” which results in injury fails to take into account the commonly accepted facts concerning asbestos injuries, as well as the parties’ stipulation of facts that "each exposure to asbestos dust can result in additional tissue changes,” and that it is "impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease.” Therefore, it is not appropriate to compare cumulative asbestos injury to the aggravation of injury which may occur after an automobile accident or to conclude that only the initial exposure to (i.e., inhalation of) asbestos is the "event * * * which result[s] in Personal Injury.” The policy provides coverage for "continuous and repeated exposure to conditions” which causes injury, and thus it is irrelevant whether the exposure is the first sustained, or the last.
The court is not unmindful of the sentiment prevailing in much of the cited case law which unabashedly seeks as its goal to maximize coverage for asbestos-related injury, or, as stated by the Keene court, "to give effect to the policies’ dominant purpose of indemnity” (667 F2d, supra, at 1041; see also, Insurance Co. v Forty-Eight Insulations, 633 F2d, supra, at 1223 [seeking an interpretation of the policy that is both a "literal construction” of the policy language and the construction which maximizes coverage]). This court cannot, however, ignore the policy’s plain meaning in pursuit of an agenda to "maximize coverage.”
In summary, this court finds that coverage is triggered under the Midland policy where the injured party is exposed to asbestos at any time during the policy period, regardless of when the party’s initial exposure occurred.

. Other approaches to the question of when bodily injury exists include Eagle-Picher Indus, v Liberty Mut. Ins. Co. (523 F Supp 110 [D Mass 1981], mod 682 F2d 12 [1st Cir 1982] [coverage triggered by actual manifestation of symptoms during policy period]); Insurance Co. v Forty-Eight Insulations (633 F2d 1212, 1218, cert denied 454 US 1109 [exposure to injurious substance is trigger for coverage]); and American Home Prods. Corp. v Liberty Mut. Ins. Co. (565 F Supp 1485, affd as mod 748 F2d 760, supra [coverage is triggered by "injury-in-fact,” that is, "real but undiscovered injury” existing within the policy period]).
The court in Flintkote Co. v American Liab. Ins. Co. (No. 808-594 [Cal Supv Dept 23, Aug. 17, 1993] [reprinted in 7 Mealey’s Lit Rpts: Insurance, Oct. 5, 1993]) has recognized that "injury-in-fact” when applied to asbestos injury "approximates a continuous trigger” (supra, at 98-99) as in Keene, since the injury-in-fact "occurs continuously from soon after exposure until death” (supra, at 119). The American Home Prods, court based its interpretation of the policy language on an analysis of New York law (see also, Abex Corp. v Maryland Cas. Co., 790 F2d 119 [DC Cir 1986]). No New York State court has yet addressed the issue directly (see, Continental Cas. Co. v Rapid-American Corp., 80 NY2d 640 [parties agree that "injury-in-fact” triggered coverage under comprehensive general liability policy]).

. No one seriously challenges the applicability of New York Law in the interpretation of the policy language.

. Exposure-in-residence refers to the subsequent continuation of injury long after exposure to asbestos ceases caused by fibers remaining in the lungs (Keene Corp. v Insurance Co., supra, at 1042). In no way can this concept be equated to the actual "continuing or repeated exposure to conditions” required by the AHAC policy. There is no factual or legal support for the hypothesis that "exposure” to asbestos continues after all inhalation of the fibers have ceased.

. Of the numerous policies listed at the end of the Keene decision (supra, at 1053-1057), only a single insurer, INA, provided a policy which may not have had the "bodily injury during the policy period” language, but since the synopsis of the policy provisions does not include a definition of "occurrence,” this cannot be determined definitely. In any event, the Keene court made no attempt to address the actual policy language.

. In this type of policy "occurrence” is defined as "one happening or series of happenings arising out of or due to one event taking place during the term of the policy.”