The UNIMAX CORPORATION and JFD
Electronics Corp., Plaintiffs,

v.

LUMBERMENS MUTUAL CASUALTY
COMPANY and Liberty Mutual Insurance Company, Defendants.

No. 92 Civ. 6115 (KTD).

United States District Court,
S.D. New York.

Nov. 21, 1995.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Bruce Birenboim, Aidan Synnott, of counsel), for plaintiffs.

Evans, Orr, Pacelli, Norton & Laffan, P.C., New York City (Frank Torres, of counsel), Tressler, Soderstrom, Maloney & Priess, Chicago, IL (Judith Fournie Helms, Catherine M. Connelly–Warren, Katharine E. Tammaro, of counsel), Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Robert L. Joyce, of counsel), for defendant Liberty Mutual Insurance Company.

KEVIN THOMAS DUFFY, District Judge.

In this insurance contract dispute, Plaintiffs seek indemnification for costs associated with the cleanup of hazardous wastes on a site in North Carolina. The following motions are currently pending:

1. Defendant Lumbermens Mutual Casualty Company's ("Lumbermens") motion for summary judgment based upon trigger of coverage;

2. Defendant Liberty Mutual Insurance Company's ("Liberty Mutual") motion

for summary judgment based upon trigger of coverage;[1]

3. Plaintiffs' cross-motion for summary judgment on the duty to defend;

4. Defendant Lumbermens' cross-motion for partial summary judgment on the lost-policy issue;

5. Plaintiffs' motion to strike portions of Liberty's reply memorandum, or in the alternative for permission to file a sur-reply;

6. Defendant Liberty Mutual's motion for leave to file an amended answer to the complaint; and

7. Defendant Liberty Mutual's motion to strike paragraph two of the supplemental affidavit of Tom Scheinman.

The following motions are unopposed and are therefore granted: Plaintiffs' motion to file a sur-reply; Liberty Mutual's motion for leave to file an amended answer to the complaint; and Liberty Mutual's motion to strike paragraph two of the affidavit of Tom Scheinman.

For the reasons stated below, Defendant Lumbermens' and Defendant Liberty Mutual's motions for summary judgment are denied; Plaintiffs' motion for summary judgment on the duty to defend is granted in part as against Defendant Lumbermens, but denied as against Defendant Liberty Mutual; and Defendant Lumbermens' cross-motion for partial summary judgment on the lost-policy issue is denied.

## I. BACKGROUND

Plaintiff Unimax is a corporation organized under the laws of Delaware with its principal place of business in New York. (AC at ¶ 2).[2] Unimax was originally formed in 1965 as Riker–Video Industries, Inc., which on or about October 28, 1968, merged into a successor company, Riker Corporation. On or about April 1, 1969, Riker Corporation merged with Maxson Electronics Corporation and became the Riker–Maxson Corporation. In 1975 Riker–Maxson Corporation changed its name to The Unimax Group, Inc., and in 1980, The Unimax Group, Inc. changed its name to The Unimax Corporation ("Unimax"). (AC at ¶ 3).

Plaintiff JFD Electronics Corp. ("JFD") is a wholly-owned subsidiary corporation of Unimax, organized under the laws of Delaware. JFD does not currently operate any business, and does not have a principal place of business. (AC at ¶ 4).

In early September 1968, Unimax purchased for JFD a television antenna production business and related assets located on a parcel of land near Oxford, North Carolina (the "Oxford site"). (Lumb.Statement of Facts ¶ 9).[3] From September 1968 to October 1979, JFD leased the Oxford site and operated the antenna production facility. (Lumb.Statement of Facts ¶ 10).

On or about October 15, 1979, JFD sublet the entire Oxford site to an affiliate of Ventura Electronics Corp. ("Ventura"), which assumed operation of the antenna production facility at that time. On or about July 15, 1980, JFD purchased the remainder of the Oxford site and simultaneously conveyed its interest in the land, assets, and business on the Oxford site to Ventura. Ventura is a predecessor-in-interest to Channel Master Satellite Systems, Inc. ("Channel Master"). (Lumb.Statement of Facts ¶ 11).

In March and April of 1986, volatile organic compounds were detected in groundwater monitor wells at the Oxford site. (Lumb.Statement of Facts ¶ 14). On June 16, 1987, North Carolina, acting pursuant to an understanding with the United States Environmental Protection Agency (the "EPA") approved a proposed cleanup plan for the Oxford site, and the cleanup began on June 30, 1987. (Lumb.Statement of Facts ¶ 15).

---

**1.** This motion corresponds to Lumbermens motion for summary judgment. Liberty Mutual states "The Liberty policies are functionally identical to the Lumbermens policies with respect to the provisions at issue on this motion.... Liberty requests that the court consider its motion, together with Lumbermen's motion." (Lib.Mut.Mem. at 1).

**2.** AC refers to the Amended Complaint.

**3.** Defendant Liberty Mutual adopted paragraphs 6–20 of Lumbermens statement of undisputed facts. (Lib.Mut.Statement of Facts ¶ 1).

On July 26, 1988, Channel Master commenced an action (the "underlying action") against Unimax, JFD, and another individual, pursuant to § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Channel Master sought recovery of costs incurred and to be incurred in response to the release or threatened release of hazardous substances at the Oxford site, which allegedly resulted in part from Unimax's and JFD's operation of the antenna production facility. Channel Master filed an Amended Complaint on June 26, 1989. (Lumb.Statement of Facts ¶ 12).

The Amended Complaint in the underlying action alleges as follows:

4. ... Prior to October 1978, defendant JFD[ ] conducted plating operations at the Oxford site which operations generated hazardous wastes that it disposed of on that site. At the time it disposed of the hazardous substances at the Oxford site, JFD was an "owner or operator" of the Oxford site, within the meaning of § 107(a)(2) of CERCLA....

11. Unimax owned and operated the Oxford site facility on September 3, 1968 during which time hazardous substances resulting from Unimax electroplating and other television antenna production operations were generated and disposed of on the Oxford site.... [D]uring the time both Unimax and JFD[ ] disposed of hazardous substances at the Oxford site, defendant Unimax was a generator and an "owner or operator" of the facility, within the meaning of ... CERCLA....

21. Hazardous substances, as defined by § 101(14) of CERCLA, ... were daily disposed of at the Oxford site before Ventura and Channel Master occupied the site.

22. At all times relevant hereto, there were "releases" or threatened releases of hazardous substances into the environment at the Oxford site....

Plaintiffs were notified by the EPA in the Fall of 1989 that they were potentially responsible parties under CERCLA for cleanup costs resulting from the alleged contamination at the Oxford site. Lib.Mut.Statement of Facts ¶ 12). Unimax and JFD claim that they first learned of the existence of the contamination at the Oxford site on August 2, 1988. (Lumb.Statement of Facts ¶ 17).

Plaintiffs notified Lumbermens and Liberty Mutual of the underlying action in August 1988. Both Defendants disclaimed coverage.

On or about December 2, 1992, Plaintiffs filed this action against Defendants Liberty Mutual, Lumbermens, and The Travelers Indemnity Company, alleging that each insurer should defend and indemnify Plaintiffs with regard to the underlying action and with respect to the related claims asserted against Unimax by the EPA. (Lumb.Statement of Facts ¶ 19). By stipulation, the complaint has been dismissed as to The Travelers Indemnity Company.

**Lumbermens' Policies**

Defendant Lumbermens issued to Unimax an umbrella comprehensive catastrophe liability policy (Policy No. 9CN 22522) (the "9CN policy") for the period from October 18, 1969 to January 1, 1971. (Lumb.Statement of Facts ¶ 1–2). The policy was made and issued in New York (Lumb.Statement of Facts ¶ 2), and it named both Unimax and JFD as insureds.

Lumbermens' 9CN policy contains the following language:

The Company [*i.e.* insurer] agrees to indemnify the insured for all sums which the insured shall become obligated to pay as damages ... by reason of liability ... imposed on the insured by law ... because of ... *property damage* ... caused by or arising out of an *occurrence which takes place during the policy period* anywhere in the world.

(Lumbermens Policy 9CN 22522 at ¶ I) (emphasis added). "Property damage" is defined in the policy as *"physical injury* to or destruction of tangible property...." (*Id.* at ¶ IV.) (emphasis added). The policy defines the term "occurrence" as "an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in ... property damage ... neither expected nor intended from the standpoint of the insured." (*Id.* at Endorsement 6).

Plaintiffs also allege, but Lumbermens disputes, that Lumbermens issued two primary

policies covering the period from October 28, 1968 to January 1, 1972. (Lumb.Statement of Facts ¶ 4–5).

### Liberty Mutual's Policies

Liberty Mutual issued four successive policies of primary comprehensive general liability insurance to Unimax for the period from January 1, 1975 to January 1, 1979. (Lib.Mut.Statement of Facts ¶ 2). JFD and Unimax are named insureds under those policies. (Lib.Mut.Counter–Statement of Facts ¶ 3). The relevant conditions and provisions of each of Liberty Mutual's policies are functionally identical. (*Id.* ¶ 4).

Liberty Mutual's policies contain language similar to Lumbermens' 9CN policy:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... *property damage* ... to which this policy applies, caused by an occurrence, and the company shall have the right and the duty to defend any suit against the insured seeking damages on account of such ... property damage....

(Policy No. LGL 121–031455–028 at ¶ I) (emphasis added). Moreover, the term "property damage" is defined as "*physical injury* to or destruction of tangible property which occurs during the policy period ...*,*" and "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (*Id.* at ¶ VI.) (emphasis added).

The Liberty Mutual policies differed from Lumbermens, however, in that they contained the following "pollution exclusion" clause:

> This policy does not apply:
>
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal,

release or escape is sudden and accidental[.]

(Lib.Mut.Reply Mem. at 2–3) (alteration in original). However, the policies at issue also contained an endorsement which stated "the [pollution exclusion clause] ... is deleted ... with respect to operations or occurrences in: ... North Carolina." (Lib.Mut.Statement of Facts ¶ 9; Policy no. LGL–121–031455–027 Endorsement 16).

## II. DISCUSSION

In the amended complaint, Plaintiffs set forth two claims for relief. The first is a breach of contract action, in which Plaintiffs allege that defendants are liable to indemnify Plaintiffs for "any and all liability that may be imposed upon Unimax or JFD and to reimburse any and all costs (including defense costs) that Unimax or JFD may incur ... in respect of each occurrence transpiring during the period to which each of defendants' respective Policies pertain." (AC at ¶ 36). Plaintiffs' second claim is for a declaratory judgment to determine "defendants' duties and obligations and Unimax's and JFD's rights under the Policies." (AC at ¶ 42).

Defendant Lumbermens moves for summary judgment on Plaintiffs' claims. Defendant Liberty Mutual joins, by separate memorandum, Lumbermens motion.

### Standard for Summary Judgment

Summary judgment is warranted only if the court determines that there are no genuine issues of material fact to be tried, and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining the existence of a material fact, I must view all evidence in the light most favorable to the non-moving party. *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). A properly asserted summary judgment motion can be defeated if the non-

moving party shows the existence of a material fact. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The non-moving party must present significant probative evidence demonstrating the existence of a triable issue of fact. *Resolution Trust Corp. v. Murray,* 935 F.2d 89, 92 (5th Cir.1991) (quoting *Southmark Properties v. Charles House Corp.,* 742 F.2d 862, 877 (5th Cir.1984)).

### III. Defendants' Motions on the "Trigger" Issue

The wording of each policy imposes liability upon the insurer for *property damage* resulting from an *occurrence* during the respective policy period. Defendants argue that North Carolina law should apply to these policies. (Lumb.Mem. at 4–5; Lib. Mut.Mem. at 1–5). Because North Carolina courts have allegedly held that an "occurrence" takes place only upon discovery of contamination, and because the contamination at the Oxford site was not discovered during Defendants' respective policy periods, Defendants argue that there were no occurrences during the policy periods.[4] Thus, Defendants claim that, under North Carolina law, the liability provisions of their policies have not been triggered.

Plaintiffs argue that New York law should govern these policies. New York law allegedly differs from North Carolina in that New York courts apply an "injury-in-fact" test to determine when an occurrence happens. According to Plaintiffs, an "occurrence" takes place when the contamination happens. Thus, if the contamination happened during the relevant policy periods, the liability provisions are triggered.

Each party also argues in the alternative that their adversary has wrongly interpreted the law of the State favored by the adversary. Thus, each party urges me to review the cases of the non-favored State and interpret that law against their adversary.

### Choice of Law

■ A court having diversity jurisdiction over a case must apply the law of the forum State, including that State's choice-of-law provisions. *See Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York's choice-of-law rules require me to apply the law of the State having the greatest interest in the outcome of the litigation. *See G. Heileman Brewing Co. v. Royal Group, Inc.,* 88 Civ. 1041 (JFK), 1991 WL 120366, at *3 (S.D.N.Y. June 21, 1991) (Keenan, J.), *on reargument,* 779 F.Supp. 736, *aff'd mem.,* 969 F.2d 1042 (2d Cir.1992). The proper procedure for a conflicts of law analysis has been set forth as follows:

> First the court must isolate the issue on which the laws conflict. Second, it must identify the purposes of the conflicting state laws to determine whether a genuine conflict exists. Third, it must examine the contacts of the interested jurisdictions to ascertain which has the closer connection with the facts of the case and thus the superior interest in seeing the law applied.

*Krauss v. Manhattan Life Ins. Co.,* 643 F.2d 98, 100 (2d Cir.1981) (citing *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954)).

■ The parties' conflicts of law arguments fail on the first step. I find that the laws do not conflict on any issue relevant to the definition of the terms in these policies. The parties have incorrectly focused their attention on how *courts* have defined terms such as "occurrence," "injury to property," and "property damage." This case, however, is centered on insurance policies—*i.e.* con*tracts*—and the appropriate conflicts analysis begins with each State's *contract* laws. New York and North Carolina apply the same rules for contract interpretation.

The North Carolina approach was set forth by that State's highest court in *C.D. Spangler Co. v. Industrial Crankshaft & Eng'g Co.,* 326 N.C. 133, 388 S.E.2d 557 (1990) (Exum, C.J.). *Spangler* involved an action for declaratory judgment seeking judicial construction to determine the meaning and

---

**4.** Liberty Mutual has adopted the legal arguments set forth in Lumbermens' papers. (Liberty Mutual Mem. at 2). Liberty Mutual argues that "as a matter of law, there has been no 'occurrence' of 'property damage' during the Liberty [Mutual] policies." (*Id.* at 6).

scope of comprehensive general liability insurance policies. *Id.*, 388 S.E.2d at 558. The court set forth "well-settled principles" for interpreting insurance policies:

> An insurance policy is a contract and its provisions govern the rights and duties of the parties thereto. . . . "As with all contracts, the goal of construction is to arrive at the intent of the parties when the policy was issued." . . . So long as it is reasonable to do so, policy provisions which extend coverage are construed liberally in favor of coverage. . . .
>
> "Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the *doubts will be resolved against the insurance company* and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the *courts must enforce the contract as written;* they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein."

*Id.*, 388 S.E.2d at 562–63 (citations omitted) (emphasis added).

New York courts are in accord with the statements in *Spangler. See, e.g., Commissioners of State Ins. Fund v. Insurance Co. of North America*, 80 N.Y.2d 992, 592 N.Y.S.2d 648, 650, 607 N.E.2d 795, 797 (1992) (holding that plain English language must be given effect); *Loblaw, Inc. v. Employers' Liability Assurance Corp.*, 57 N.Y.2d 872, 877, 456 N.Y.S.2d 40, 42–43, 442 N.E.2d 438, 440–41 (1982) (Fuchsberg, J., concurring) ("when the meaning of an insurance contract is plain and clear, . . . all parties . . . [are] entitled to have it enforced according to its terms . . . [and] this entitlement is not to be subverted by straining to find an ambiguity

which otherwise might not be thought to exist." (citations omitted)); *Kula v. State Farm Fire & Casualty Co.*, 212 A.D.2d 16, 628 N.Y.S.2d 988, 990 (A.D. 4th Dep't 1995) ("The court must ascertain the intent of the parties from the plain meaning of the language employed, giving terms their plain, ordinary, popular and non-technical meanings. . . . [W]here a particular provision is susceptible to more than one reasonable interpretation, all *ambiguities must be resolved in favor of the insured.*" (citations omitted) (emphasis added)), *reargument denied*, 1995 WL 582270 (Sept. 29, 1995); *see also Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993) (interpreting insurance policy). Thus, there is no conflict between New York and North Carolina laws regarding interpretation of the insurance policies at issue.

■ My interpretation of the policies begins, therefore, not with how New York and North Carolina define the term "occurrence," but with how the parties defined the term in the policies. Defendants are liable for any "occurrence" which happened during the policy period. An "occurrence" is defined as "an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in . . . property damage," and property damage is defined as "physical injury to or destruction of tangible property." (Lumbermens Policy 9CN 22522 at ¶ IV and Endorsement 6). Thus, if physical injury results during the policy period from an accident or repeated exposure to conditions, the liability provisions of the policies are triggered.

The parties do not dispute, at this point, the cause of the contamination. Rather, they focus on the timing of the occurrence. Despite the parties' *post hoc* arguments, however, the policy clearly states that an occurrence takes place if physical injury results during the policy period. Thus, if there is physical injury during the policy period, the liability provisions are triggered, and Defendants are liable.

Defendant Lumbermens argues, however, that the language of the contract should be ignored. According to Lumbermens, "[e]co-

nomic damage is the measure of property damage. Therefore, property damage cannot take place until the damage is known or recognized." (Lumb.Reply Mem. at 17–18). This interesting theory does not comport with the insurance policies' plainly-worded definition of property damage as "physical injury." If the insurers had intended for economic injury to be the test, they were free to draft their policies accordingly. Since they failed to do so, the test is whether the property has sustained physical injury.

■ Therefore, the only remaining issue regarding the timing of the occurrence is whether contamination by hazardous wastes constitutes physical injury. Regardless of which State's law applies, contamination is deemed to be physical injury. The North Carolina Supreme Court has clearly stated that "the contamination of the State's resources such as groundwater and soil . . . is a 'physical injury to . . . tangible property . . .,' and is therefore 'property damage'. . . ." *Spangler*, 388 S.E.2d at 565. New York courts also consider contamination to be physical injury and property damage. *See, e.g., Cortland Pump & Equip. Inc. v. Firemen's Ins. Co.*, 194 A.D.2d 117, 604 N.Y.S.2d 633, 636 (3d Dep't 1993) (discussing trigger issues with respect to "property damage caused by contamination from hazardous materials"), *leave to appeal denied*, 83 N.Y.2d 760, 616 N.Y.S.2d 479, 640 N.E.2d 147 (1994). Therefore, an "occurrence" takes place at the time contamination happens.

Contamination during the policy period triggers the liability provisions of the policies. Accordingly, Defendant Lumbermens motion for summary judgment is denied.

### Proof of Property Damage

■ Defendant Liberty Mutual asserts that Unimax failed to oppose Liberty's motion for summary judgment on the "trigger issue" with relevant and admissible evidence that property damage resulted during the policy periods. (Lib.Mut.Reply Mem. at 29). According to Liberty Mutual, the basis of Liberty Mutual's motion was that there was no property damage during the relevant periods; therefore, Unimax had the burden to come forward with facts showing property

damage within Liberty's policy periods. (*Id.* at 31–32).

This argument is nonsense. The focus of Liberty Mutual's motion was that contamination was not considered *under the law* to be property damage until the discovery of the damage. Liberty Mutual did not argue that no contamination had occurred during its policy periods.

The statement of facts adopted by Liberty Mutual and the Amended Complaint in the underlying action assert sufficient facts to overcome Liberty Mutual's motion for summary judgment on the duty to indemnify. Among the allegations in the underlying action are the following statements:

21. Hazardous substances, as defined by § 101(14) of CERCLA, . . . were daily disposed of at the Oxford site before Ventura and Channel Master occupied the site.

22. At all times relevant hereto, there were "releases" or threatened releases of hazardous substances into the environment at the Oxford site. . . .

The issue of when contamination occurred is a material question of fact that precludes summary judgment on the issue of indemnification. Accordingly, Defendant Liberty Mutual's motion for summary judgment is denied.

### IV. Plaintiffs' Cross–Motion on the Duty to Defend

Plaintiffs filed a cross-motion for summary judgment, seeking a declaration that the policies impose a duty on Lumbermens and Liberty Mutual to defend Plaintiffs from the underlying environmental-cleanup actions.

■ The duty to defend is broader than the duty to indemnify, *Continental Casualty*, 80 N.Y.2d at 648, 593 N.Y.S.2d at 969, 609 N.E.2d at 509, and has been explained as follows:

An insurer must defend whenever the four corners of the [underlying] complaint suggest—or the insurer has actual knowledge of facts establishing—a reasonable possibility of coverage. . . . The duty is broader than the insurer's obligation to indemnify: "[t]hough policy coverage is often denominated as 'liability insurance', where

**156**

the insurer has made promises to defend 'it is clear that [the coverage] is, in fact, "litigation insurance" as well.' "

*Id.* (citations omitted).

■ According to Plaintiffs, the Amended Complaint in the underlying action alleges facts which, if true, would give rise to the insurers' liability for indemnification. Moreover, Plaintiffs incorporated by reference into their Amended Complaint Channel Master's allegations in the Amended Complaint in the underlying action. (Lumb.Statement of Facts ¶ 16). Since the underlying action suggests a reasonable possibility of coverage, Plaintiffs argue that Defendants must pay Plaintiffs' defense costs associated with the underlying action.

Neither defendant disputes that it has made promises to defend Plaintiffs.

Defendant Lumbermens makes no argument, other than the "trigger" issue, regarding the duty to defend. Based on the definition of "occurrence" contained in Lumbermens policy, I find that the underlying action alleges "occurrences" during Defendant Lumbermens policy period. The duty to defend is, therefore, triggered as to Lumbermens. Plaintiffs' cross-motion for summary judgment is granted as against Lumbermens.[5]

### Liberty Mutual's Pollution Exclusion Clause

■ Defendant Liberty Mutual argues that if New York law applies to its policies, the pollution exclusion clause contained therein excludes coverage for the occurrences at issue here. The clause states:

This policy does not apply:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]

(Lib.Mut.Reply Mem. at 2–3) (alteration in original). This clause was required by a New York statute during the term of the policies. N.Y.Ins.Law § 46(13) & (14) (in effect from 1971 to 1982) (recodified as § 1113 in 1985). However, the policies at issue also contained an endorsement that deleted the pollution exclusion clause with regard to occurrences in North Carolina. (Lib.Mut.Reply Mem. at 3).

According to Liberty Mutual, if New York law applies to these policies, the pollution exclusion clause must be enforced because it was required by statute in New York. If I apply the law of North Carolina, however, the exclusion clause does not protect Liberty Mutual.

Because the Oxford site is located in North Carolina, there are strong policy reasons for applying the law of North Carolina to this pollution exclusion clause. *See G. Heileman Brewing,* 1991 WL 120366, at *3 (stating that Michigan will "have to wrestle with problems associated with the cleanup of the site.... Michigan's interest in the speedy cleanup of its toxic waste sites will be furthered by resolution of the dispute ... concerning who is responsible to pay for the cleanup."). Moreover, Defendant Liberty Mutual has argued vigorously that the parties intended that the policies be governed by North Carolina law. According to Liberty Mutual, the "only conceivable explanation for the endorsement which removes the pollution exclusion is that the parties contemplated that North Carolina law would govern the 'operations' and 'occurrences' in that state." (Lib.Mut.Reply Mem. at 4).

· Nonetheless, I am not swayed that there is an actual conflict requiring the application of North Carolina's laws. The New York statutory provision that required the pollution exclusion clause was in effect from 1971 to 1982. *See Continental Casualty,* 80 N.Y.2d at 652, 593 N.Y.S.2d at 972, 609 N.E.2d at 512. The purpose of the statute was to " 'assure that corporate polluters bear the full burden of their own actions spoiling the environment.' " *Id.* (quoting 1971 McKin-

---

**5.** As noted in Part V, *infra,* there remains a genuine issue of material fact as to the content of

one Lumbermens policy. Therefore, this holding does not apply to that policy.

ney's Session Laws of N.Y. at 2633). However, the clause has not been required since 1982, because polluters were not paying for the costs of cleanup; "polluters who could not insure themselves simply went out of business when the liability arose." *Id.* (citing 1982 McKinney's Session Laws of N.Y. at 2628–29).

The Court of Appeals for the State of New York has found one similarly-worded clause to be ambiguous and has refused to enforce it. *Continental Casualty,* 80 N.Y.2d at 655; 593 N.Y.S.2d at 973, 609 N.E.2d at 513. In *Continental Casualty,* the court found for the insured on policies that had been issued during the time when pollution exclusion clauses were mandatory. Although that case involved personal injury rather than property damage, the court's willingness to disregard an ambiguous exclusion clause indicates that the State's interest in having those clauses enforced is minimal.

Here, an endorsement to the contract specifically deleted the pollution exclusion clause with regard to operations in North Carolina. If New York law governs these policies, that endorsement was misleading and created, at least, an ambiguity regarding the breadth of the pollution exclusion clause. The ambiguity must be construed in favor of the insured. *See, e.g., In re Midland Ins. Co.,* 164 Misc.2d 363, 623 N.Y.S.2d 689, 693 (1994) ("ambiguities in contracts, ... will be construed against the drafter...."); *Spangler,* 388 S.E.2d at 562–63. Therefore, the pollution exclusion clause does not relieve Liberty Mutual of liability.

**Timeliness of Notice**

Defendant Liberty Mutual argues that even if the occurrences happened during the policy periods, it is not liable because Plaintiffs failed to satisfy a condition precedent to recovery—*i.e.* to provide timely notice of occurrences. (Lib.Mut.Opp. to Duty to Defend). Plaintiffs argue that they gave timely notice, and that Liberty Mutual has waived the right to assert the "timely notice" defense.

The Liberty Mutual policies state, in part, that "[n]o action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy." (¶ 5). Moreover, the policies state that "[i]n the event of an occurrence, written notice ... shall be given by or for the insured to the company ... as soon as practicable...." The policies also state that "[i]f claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

The timely notice requirement is enforceable, and where the delay in giving notice is otherwise unreasonable, the insured must explain the delay. *See Security Mutual Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 441–43, 340 N.Y.S.2d 902, 906–08, 293 N.E.2d 76, 79–80 (1972) (holding that insured failed to explain a delay of nineteen months). However, the Court of Appeals of New York has held that

> [w]hen the facts of an occurrence are such that an insured acting in good faith would not reasonably believe that liability on his part will result, notice of the occurrence given by the insured to the insurer is given "as soon as practicable" if given promptly after the insured receives notice that a claim against him will in fact be made.

*Merchants Mutual Ins. Co. v. Hoffman,* 56 N.Y.2d 799, 801, 452 N.Y.S.2d 398, 399, 437 N.E.2d 1155, 1156 (1982); *see also St. Clare's Hospital & Health Ctr. v. Insurance Co. of North America,* 934 F.2d 15, 19 (2d Cir. 1991). "The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at the time would have suggested to a reasonable person the possibility of a claim." *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 272 (2d Cir.1987).

Liberty Mutual claims that the notice requirement was not satisfied because Plaintiffs failed to provide timely notice of an occurrence.[6] Liberty Mutual argues that

---

6. Liberty Mutual does not argue that Plaintiffs failed to provide timely notice of the underlying action.

"senior JFD personnel had substantial knowledge [throughout the 1970's] of the potential for claims from its Oxford production plant." (Lib.Mut.Opp. to Duty to Defend at 30). Plaintiffs did not provide notice of any environmental problem at the Oxford site until August of 1988. Liberty Mutual contends that Plaintiffs failed to satisfy the condition precedent that notice of an occurrence be given as soon as practicable.

The delay between the occurrences at issue here—*i.e.* the contamination of the Oxford site—and the notice to Liberty Mutual was more than twelve years. Plaintiffs, therefore, must explain the reason for the delay. According to Plaintiffs, any damage that was inflicted was done unknowingly and Plaintiffs reasonably believed that no liability would result from their actions. (Pl.Reply on Duty to Defend and Opp. to Lumbermens' Cross-motion at 18–19).

Plaintiffs' explanation appears reasonable in view of the nature of the occurrences here. However, Liberty Mutual disputes Plaintiffs' knowledge during the relevant periods. (Lib.Mut.Opp.Defend Mem. at 4–20). According to Liberty Mutual, Plaintiffs had received complaints from the City of Oxford as early as 1972 regarding the effects of Plaintiffs' waste water on Oxford's sewage treatment plant. (*Id.*) This, Liberty Mutual argues, was sufficient to give Plaintiffs "substantial knowledge of the potential for claims from its Oxford production plant." (Lib.Mut.Opp.Duty to Defend at 30).

I find that Defendant Liberty Mutual has raised a genuine issue of material fact regarding Plaintiffs' knowledge during Liberty's policy periods. Accordingly Plaintiffs' motion for summary judgment on the duty to defend must be denied.

▮▮▮ Plaintiffs argue, however, that Liberty Mutual has waived the defense of late notice. (See Pl.Reply Mem.Duty to Defend and Opp. to Lumbermens Cross-Motion at 12). "[A]n insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, *and where the insurer possesses sufficient knowledge* (actual or constructive) of the circumstances regarding the unasserted defense." *State of New York v. AMRO Realty*

*Corp.*, 936 F.2d 1420, 1431 (2d Cir.1991) (emphasis added).

Liberty Mutual disclaimed coverage in May 1990, but did not include the "late notice" defense in its disclaimer letter. This defense was raised for the first time when Liberty filed its Answer to the Complaint in October 1992. (Pl.Reply Mem. at 12). Liberty Mutual admits that it "did not predicate its [May 17, 1990] *denial* of coverage on the ground of late notice," (Lib.Mut.Sur–Reply at 2), but argues that, by letter dated May 5, 1989, it reserved its right to raise that defense if new information deemed the defense appropriate. (*Id.*).

According to Liberty Mutual, it did not learn of the relevant facts regarding the City of Oxford's complaints against Plaintiffs until discovery had commenced in this action; therefore, it lacked sufficient knowledge to raise the "late notice" defense. (Lib.Mut.Sur–Reply at 2–3). Plaintiffs assert that Liberty Mutual had constructive knowledge when Liberty's "claims examiner review[ed] the files of the North Carolina Department of Human Resources [ ("NCDHR") ], including the exhibits ... submitted [by Liberty Mutual] in support of Liberty's 'late notice' argument." (Pl.Reply on Motion to Strike at 22).

There are genuine issues of material fact which preclude a judgment as a matter of law on the waiver issue.

## V. Lumbermens Cross–Motion on the Lost–Policy Issue

Plaintiff asserts that Defendant Lumbermens is liable under three insurance policies. Policy number 9CN 22 522 (the "9CN Policy") was a Comprehensive Catastrophe Liability Policy that covered the period from October 18, 1969 to January 1, 1971. (Pl. Opp.Mem. at 7). According to Plaintiff, Lumbermens also issued two primary comprehensive general liability policies numbered 1ZL 554 983 (the "1ZL Policy") and 8ZL 554 983 (the "8ZL Policy"), which covered the periods from October 28, 1968 to January 1, 1971, and from January 1, 1971 to January 1, 1972, respectively. (Pl.Opp.Mem. at 8–9). Lumbermens does not dispute the existence or content of the 9CN policy. It

does, however, seek summary judgment with regard to the 8ZL policy on the ground that Plaintiffs have failed to prove the existence and content of that policy. (Lumb.Cross–Motion Mem. at 4–6). It also opposes Plaintiffs' motion for summary judgment on the duty to defend under the 1ZL policy, alleging that a genuine issue of material fact exists as to the existence and content of the 1ZL policy. (*Id.* at 6).

### The 1ZL policy

■ Plaintiffs' arguments for the existence and content of the 1ZL policy are based on documents provided by Lumbermens which appear to be an incomplete set of papers constituting the 1ZL policy. Although policy pages were produced by Lumbermens bearing the 1ZL policy number, Lumbermens argues that those pages may not be evidence of the existence of the policy because "they *may* have been generated only for purposes of performing a test audit." (*Id.* at 7) (emphasis added). This assertion is based on the affidavit of Roger T. Ecklund, the Assistant Special Risk Officer for the Special Risk Underwriting Department of the Kemper Group of Insurance Companies, which states, "There is a possibility that the information contained in [the alleged 1ZL policy documents] was generated to enable LMC to perform a test audit on the plaintiffs." (Ecklund Aff. ¶ 8). As for the content of the 1ZL policy, Lumbermens argues four facts that allegedly render the policy's content uncertain. First, the 1ZL policy is missing at least two endorsements that would modify coverage under the policy. (Lumb.Opp. to Duty to Defend Motion at 6). Second, the 1ZL policy is missing a policy jacket, which contains the "conditions" section of the policy. Third, not all pages of the 1ZL policy were executed by countersignature, "which *may* indicate that not all of the pages … were *necessarily* incorporated into the final version of alleged [1ZL policy]." (*Id.* at 6–7) (emphasis added). Fourth, the declarations page contains handwritten notations that "*may* indicate that the information produced by LMC constituted a working copy of the alleged policy." (*Id.* at 7) (emphasis added).

I find Lumbermens arguments wholly unpersuasive and insufficient to raise a genuine issue of material fact. Plaintiffs have presented nearly one-hundred pages bearing the 1ZL policy number. The only pages known to be missing are two endorsements and the policy jacket. Here, the pages presented by Plaintiffs were contained in Lumbermens' files and were turned over to Plaintiffs during discovery. (*Id.* at 6). Lumbermens has controlled those documents for over twenty years.

I find it incredible that Lumbermens would retain this file, which imposes liability, but lose the documents that may have relieved Lumbermens of liability. Therefore, the documents bearing the 1ZL policy number are presumed to be the 1ZL policy. Lumbermens has the burden to demonstrate that the 1ZL policy was a test audit or that it contained exclusions or conditions that would have relieved Lumbermens of liability.

Lumbermens has not presented any evidence to indicate that the documents were merely a test audit. Moreover, the notion that the 1ZL policy papers represent a test audit is belied by the fact that "some of the pages … were executed by counter-signature." (Lumb.Opp. to Duty to Defend Motion at 6). Therefore, I find that there is no genuine issue of material fact regarding the existence of the 1ZL policy.

Lumbermens' mere speculation as to the content of missing endorsements and possible conditions contained in the policy jacket will not suffice to meet Lumbermens' burden. Conjecture regarding the meaning of handwritten annotations and allegedly missing countersignatures is likewise inadequate. Accordingly, Lumbermens' motion for summary judgment regarding the 1ZL policy is denied. Liability will be measured according to the terms of the 1ZL policy as it existed in Lumbermens files.[7]

### The 8ZL policy

■ Plaintiffs assert that the 8ZL policy was identical to the 1ZL policy because they bear the same suffix. Plaintiffs also assert that a reference in the 9CN policy to the 8ZL

---

**7.** The 1ZL policy contains language nearly identical to the 9CN policy. (*See* LU 000483).

policy proves the existence of the 8ZL policy. Lumbermens argues that, as a matter of law, the reference to the 8ZL policy within the 9CN policy is insufficient to prove its existence or content. (Lumb.Opp. to Duty to Defend Motion at 3) (citing *Boyce Thompson Inst. v. Insurance Co. of North America*, 751 F.Supp. 1137, n. 2 (S.D.N.Y.1990)). However, I find that because the 9CN policy—a policy issued by Lumbermens—referred to the 8ZL policy, Plaintiffs have adequately demonstrated the existence of the 8ZL policy. Nonetheless, a genuine issue of material fact exists as to the content of the 8ZL Policy.

 Although Plaintiffs have demonstrated that the 1ZL policy was possibly a renewal of the 8ZL policy, and thus the contents of the two were possibly identical, Plaintiffs have not yet adequately demonstrated the content of the 8ZL policy. It would be inappropriate at this stage to grant summary judgment in favor of Plaintiffs on the 8ZL policy. However, Plaintiffs should be allowed the opportunity to prove that the 8ZL and 1ZL policies were the same. Thus, it is also inappropriate to rule that Plaintiffs are precluded from recovery under the 8ZL policy. Plaintiffs' and Defendant Lumbermens' cross-motions are denied as to the 8ZL policy.

## VI. CONCLUSION

Defendants Lumbermens and Liberty Mutual erroneously argued for an improper interpretation of the policies at issue. As set forth above, I find the interpretation to be the same under both North Carolina and New York laws. I find further that there is a genuine issue of material fact whether occurrences at issue happened during the policy periods. Therefore, Defendants' motions for summary judgment are denied.

Furthermore, I find that the complaint in the underlying action has alleged that occurrences happened during Lumbermens' policy periods. Therefore, the duty to defend has been triggered, except as to one policy. Accordingly, Plaintiffs' cross-motion is granted in part against Lumbermens.

Plaintiffs' cross-motion is denied as against Liberty Mutual, because there is a genuine issue of material fact regarding Plaintiffs' satisfaction of a condition precedent to Liberty Mutual's liability.

Defendant Lumbermens' cross-motion for partial summary judgment on the lost-policy issue is denied.

SO ORDERED.