# A.W. Chesterton Company *vs.* Massachusetts Insurers Insolvency Fund.

Middlesex. October 6, 2005. - December 12, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Massachusetts Insurers Insolvency Fund. Laches. Asbestos. Insurance,* Insolvency of insurer, Misrepresentation, Coverage, Construction of policy, Insurer's obligation to defend. *Indemnity. Words,* "Occurrence," "Bodily injury."

In an action in Superior Court concerning the liability of the Massachusetts Insurers Insolvency Fund (fund) on excess indemnity policies issued by an insurer covering certain asbestos-related liability claims made against an insured, the judge's clear subsidiary findings were justified by the evidence and amply supported his conclusions that the insured had made no false statements or misrepresentations in connection with three of its applications for the policies [512-515]; that the insured had made material misrepresentations in its application for coverage for a fourth policy [515-517]; and that the doctrine of laches did not bar the fund from raising the issue of the alleged misrepresentations made by the insured in its applications for the policies [517-518].

In an action in Superior Court concerning the liability of the Massachusetts Insurers Insolvency Fund on three excess indemnity policies issued by an insurer covering certain asbestos-related liability claims made against an insured, the judge erred in concluding that the trigger of coverage on all of the policies was bodily injury occurring during the policy period, where the plain language in two policies required that coverage be triggered by asbestos exposure or inhalation, and not by bodily injury, during the policy period. [518-523]

In an action in Superior Court concerning the liability of the Massachusetts Insurers Insolvency Fund (fund) on excess indemnity policies issued by an insurer covering certain asbestos-related liability claims made against an insured, the judge properly concluded that the fund had no obligation to indemnify the insured for covered claims until the limits of all solvent excess coverage providing for indemnification had been exhausted [523-526], and that the insured was not required to exhaust all "ultimate net loss" coverages from other solvent insurers before the fund was obligated to defend the insured [526-527].

Civil action commenced in the Superior Court Department on August 14, 1996.

Motions for partial summary judgment were heard by *David A. McLaughlin,* J., the case was tried before him, and a motion to amend the judgment was also heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Martin F. Gaynor, III (Nicholas D. Stellakis* with him) for the plaintiff.

*Joseph C. Tanski & Gregory P. Deschenes (Gregg A. Rubenstein & Christine Vargas Suthoff* with them) for the defendant.

The following submitted briefs for amici curiae:

*Laura A. Foggan & Alicia C. Ritter,* of the District of Columbia, *& Michael R. Coppock* for Complex Insurance Claims Litigation Association.

*David L. Elkind, Elizabeth A. Sherwin, & John A. Gibbons,* of New York, *Martin C. Pentz, Karen L. Crocker, Michael P. Angelini, & Vincent F. O'Rourke, Jr.,* for Massachusetts Electric Company & another.

GREANEY, J. This case (here on direct appellate review) concerns the liability of the Massachusetts Insurers Insolvency Fund (Fund) on excess indemnity policies issued by Midland Insurance Company (Midland) to A.W. Chesterton Company (Chesterton) covering asbestos-related liability claims involving Chesterton products. Although other insurers were involved in the case, the only parties to this appeal are Chesterton and the Fund. We confine ourselves to the issues raised by these parties, which concern conclusions of a judge in the Superior Court that:

(1) The Fund is not barred by laches in raising the issue of misrepresentation by Chesterton in its applications for four Midland policies;

(2) Chesterton had not made misrepresentations (as defined by G. L. c. 175, § 186) in its applications for three of the Midland policies, but had made misrepresentations on the application for the fourth policy that voided the policy;

(3) the trigger of coverage on the valid Midland policies is bodily injury occurring during the policy period;

(4) the Fund has no obligation to indemnify Chesterton until the limits of all solvent excess coverage providing for indemnification have been exhausted; and

(5) applicable law does not require that Chesterton exhaust all "ultimate net loss" coverages before the Fund is obligated to defend Chesterton.

We agree with the judge on the misrepresentation and laches issues. We also agree with the judge's conclusions with respect to the extent of the Fund's obligations to defend or indemnify Chesterton on Midland's covered claims. In our view, however, plain language contained in two of the valid Midland policies requires that coverage under those policies be triggered by asbestos exposure or inhalation, and not by bodily injury, during the policy period. We modify that part of the judgment to read accordingly.

1. We first summarize the general background of the case. Chesterton, a company with headquarters in Stoneham, manufactures and distributes products that for many decades contained asbestos. During the years relevant to this appeal, Chesterton maintained primary comprehensive general liability insurance policies and multiple layers of excess indemnity policies with coverage for asbestos-related liabilities. In January, 1980, the first claim alleging bodily injury caused by the inhalation of asbestos was asserted against Chesterton. By the time of trial, over 300,000 such claims had been asserted against Chesterton, alleging bodily injury, or death, due to exposure to asbestos fibers. Chesterton initially sought to have the claims defended and, if necessary, indemnity paid by its primary general liability insurers. When Chesterton perceived that the indemnity limits of its primary coverages had been exhausted, it demanded that insurers that had issued it excess insurance coverage provide indemnity and defense in accordance with the terms of those excess policies. A significant number of those insurers declined to provide Chesterton with a defense to, or indemnification for, remaining underlying claims against it. In August, 1996, Chesterton filed a complaint in the Superior Court alleging breach of contract and seeking a declaration of the scope of the obligations of certain of its excess carriers with respect to their duties to defend and to indemnify the company on the underlying claims against it.

The Fund is a nonprofit unincorporated legal entity created

by G. L. c. 175D, § 3, to pay covered claims[1] against an insolvent insurer (up to $300,000 per claim, see note 4, *infra*).[2] See *Clark Equip. Co.* v. *Massachusetts Insurers Insolvency Fund*, 423 Mass. 165, 166-167 (1996). It was named in Chesterton's complaint because four of the excess indemnity policies, covering the time span between February 1, 1980, and February 1, 1984, had been issued by Midland, an insurer that has become insolvent. Pursuant to G. L. c. 175D, § 5 (1), the Fund is liable to the extent of Midland's obligation on the covered claims against Chesterton. See *Norfolk & Dedham Mut. Fire Ins. Co.* v. *Quane*, 442 Mass. 704, 704-705 n.2 (2004).

A trial was held to determine whether Chesterton had in fact exhausted its primary policies. Prior to that trial, all of the parties (which, as has been indicated, included excess carriers that are no longer part of this appeal) stipulated to the nature of bodily injury caused by exposure to asbestos as follows:

> "The parties hereby stipulate that with respect to each Underlying Claim at issue, bodily injury will be considered to have taken place continuously from the time that each Underlying Claimant was first exposed to asbestos until the date of diagnosis, death or the filing of the Underlying Claim, whichever occurs earliest."

Based on this stipulation, and on the language of the relevant policies, the judge concluded that each of Chesterton's primary policies had been triggered by bodily injury during the policy period and that the insurers that had issued the triggered policies were jointly and severally liable for the entirety of each covered claim against Chesterton, up to the policy limits. This

---

[1]Section 1 (2) of G. L. c. 175D defines a "[c]overed claim" as an "unpaid claim . . . which arises out of and is within the coverage of an insurance policy . . . issued by an insurer, if such insurer becomes an insolvent insurer and . . . the claimant or insured is a resident of the commonwealth."

[2]The Fund's obligations and expenses are assessed, with certain exceptions, to insurers that write direct insurance to which G. L. c. 175D applies, see §§ 1 (5), 5 (1) (*c*), and that recoup amounts paid into the Fund primarily by increasing their rates and premiums. See G. L. c. 175D, § 13. "The cost of paying claims against insolvent insurers 'is thus ultimately passed on to the insurance-buying public.' " *Clark Equip. Co.* v. *Massachusetts Insurers Insolvency Fund*, 423 Mass. 165, 167 (1996), quoting *Massachusetts Motor Vehicle Reinsurance Facility* v. *Commissioner of Ins.*, 379 Mass. 527, 530 (1980).

ruling determined that the indemnity payments to the underlying claimants were to be allocated to all relevant primary policies in effect between (1) the time of a claimant's first exposure and (2) the date of diagnosis, death, or claim against Chesterton, whichever happened first. Neither Chesterton nor the Fund challenged this ruling and, therefore, the "all sums" method of allocation of liability has become the law of this case.[3] See *King* v. *Driscoll*, 424 Mass. 1, 7-8 (1996). Based on the testimony of two expert witnesses, and documentary evidence, the judge concluded that Chesterton had met its burden in demonstrating that the limits of all relevant primary policies had been exhausted.

The judge then considered a series of motions for partial summary judgment filed by the Fund seeking declarations with respect to six issues regarding its duty to defend and indemnify Chesterton. The judge concluded that partial summary judgment should enter declaring, in effect, that (1) the Fund has no duty to defend actions against Chesterton, unless and until Chesterton establishes that it has exhausted the limits of duty to defend (but not the "ultimate net losses") coverages provided by solvent excess carriers; (2) the Fund has no obligation to make indemnity payments to Chesterton, unless and until Chesterton establishes that it has exhausted the limits of indemnity coverages provided by solvent carriers; (3) the Fund's duty to defend Chesterton is not limited to claims in which the claimant alleges inhalation of asbestos fibers during the policy period, but includes claims in which the claimant alleges that there was a Midland policy in existence during the period between the dates

---

[3]Other insurers in the case had argued for a "pro rata" method of allocation, in which liability for claims involving a continuous injury, or an extended period of time between the initial exposure to injury and the date a claim is presented, such as the underlying claims in this case, is spread over the entire period of injury and shared by the insurers according to their "time on the risk." The proper allocation of so-called "long tail" claims has twice been addressed by the Appeals Court and twice resolved in favor of the "all sums" method. See *Chicago Bridge & Iron Co.* v. *Certain Underwriters at Lloyd's, London*, 59 Mass. App. Ct. 646, 653-655 (2003); *Rubenstein* v. *Royal Ins. Co.*, 44 Mass. App. Ct. 842 (1998), *S.C.*, 429 Mass. 355 (1999). We have not had occasion to address the merits of an "all sums" versus a "pro rata" method of allocation. Because neither party argues the latter, analysis of the issue should wait for another day.

of first inhalation of asbestos fibers and the date of diagnosis, death, or claim; (4) the Fund's obligation to indemnify Chesterton is not limited to claims in which the claimant alleges inhalation of asbestos fibers during the policy period, but includes claims in which the claimant alleges that there was a Midland policy in existence during the period between the dates of first inhalation of asbestos fibers and the date of diagnosis, death, or claim; (5) the Fund's duty to defend Chesterton arises after Chesterton has exhausted the limits of duty to defend coverages provided by solvent carriers and is extinguished as to a specific underlying policy when the indemnity limits of that policy have been exhausted; (6) the Fund's obligation to indemnify Chesterton as to claims covered by valid Midland policies arises after Chesterton has exhausted the limits of the indemnity coverages provided by solvent excess carriers applicable to such claims and is extinguished as to a specific underlying policy when the indemnity limits of such policy have been exhausted. The judge also allowed the Fund's motion for partial summary judgment for a declaration that any obligation to indemnify Chesterton under the Midland policies is limited by G. L. c. 175D to an aggregate amount of $299,999 for each bodily injury claim, including consortium claims and derivative claims, and to $299,999 for fees and costs incurred in the defense of each bodily injury claim.[4]

2. Against this background, the judge held a trial to decide whether the Fund's obligations to indemnify or to defend could be avoided because of alleged misrepresentations made by Chesterton in its applications for coverage for four Midland policies that were in effect from February 1, 1980, to February 1, 1981 (first policy); February 1, 1981, to February 1, 1982 (second

---

[4]Section 5 (1) (*a*) provides that the Fund's obligations under each covered claim, with certain exceptions, "shall include only that amount . . . less than three hundred thousand dollars." This court has stated that a "claimant" under G. L. c. 175D "refers to the person now asserting the claim, either the underlying tort claimant or the insured may be a [G. L.] c. 175D claimant." *Clark Equip. Co.* v. *Massachusetts Insurers Insolvency Fund*, 423 Mass. 165, 168 (1996). The judge reasoned that if an insured is a claimant within the meaning of G. L. c. 175D, then an insured's demand for defense costs provided by the policy can be characterized as a covered claim. Thus, the statutory limit of $299,999 applies independently to fees and costs incurred in the defense of any one bodily injury claim.

policy); February 1, 1982, to February 1, 1983 (third policy); and February 1, 1983, to February 1, 1984 (fourth policy). At trial, the Fund claimed that the absence of any reference, in Chesterton's applications for coverage during the four policy years, to either asbestos-containing products or to lawsuits claiming damages related to asbestos, were factual misrepresentations. These misrepresentations, argued the Fund, were made with actual intent to deceive or, alternatively, the misrepresentations increased Midland's risk of loss and, thus, under G. L. c. 175, § 186, were material and rendered the policies void. Chesterton argued that the doctrine of laches[5] prevented the Fund from asserting the affirmative defense of misrepresentation in order to avoid its obligations under the policies.

The judge's findings, which are not disputed in any material respect, may be summarized as follows. During the period of time relevant to this appeal, Chesterton had retained the services of a retail insurance agency, Fred S. James (James), to obtain insurance policies that would provide Chesterton with indemnity coverage for personal liability claims, including claims based on asbestos-related bodily injury, in excess of that provided by its primary comprehensive general liability policies. James submitted applications for the four policy years in question to Capacity Managers International, Inc. (CMI), a corporate entity authorized to underwrite risks and execute policies and other insurance documents on behalf of Midland. Each application was prepared using the same standard excess liability insurance form.

The judge focused on three questions in the application form and found that Chesterton's responses were, essentially, the same in all four years. Question 4 asked for a "Complete description of all operations." Chesterton's response referred to an exhibit attached to the application that included an entry, entitled "Operations," providing that "Applicant manufacturers and sells packs, seals and lubricants throughout the United

---

[5]Chesterton also presented arguments at trial that the related doctrines of estoppel or waiver barred the Fund's attempts to avoid its liability under Midland's policies. On appeal, Chesterton relies solely on the doctrine of laches.

States, Canada and about [eighty] countries overseas." Question 17 stated "Past Losses: Enumerate below all losses paid or now reserved in excess of $10,000 as respects accidents occurring during the past five years." Chesterton's response was "NONE." Question 25 was a declaration stating: "We know of no other relevant facts which might affect the company's judgment when considering this application." Chesterton did not place any information in that block. Below Question 25 was a line for the applicant's signature. In at least one of the years, the application form submitted to CMI was signed by Chesterton and, in the remaining years, the line below Question 25 was left blank.

The application for the first policy was dated December 10, 1979, and sent to CMI on December 18. CMI followed its customary practices with respect to the issuance of any insurance policy. CMI would rely on the application and an applicant's loss experiences, brochures, and annual reports, and, after a review of those materials, would make contact with the broker and discuss the limits, pricing, and the risk involved. After receiving Chesterton's initial application, and before the issuance of the first policy, CMI and James did in fact communicate regarding Chesterton products. Midland issued the first policy.

On January 2, 1980, Chesterton was served as one of twenty-three defendants in an action commenced in Ohio by four plaintiffs claiming to have been injured by "asbestos and asbestos insulation materials" purchased by their employer, the Clark Asbestos Company. Chesterton responded by notifying its primary insurer at that time, Liberty Mutual Insurance Company (Liberty Mutual), and by initiating its own investigation into the claims. Chesterton took the position that none of its products was involved in those claims. Despite its sincere conviction that the claims against it were meritless, Chesterton hired outside counsel to provide advice with respect to the Ohio claims.

In early 1980, Chesterton was served as a defendant in two Illinois lawsuits, in which three claimants alleged that they had sustained injuries when a pump containing a seal manufactured by Chesterton exploded. Asbestos was not involved in any of these claims.

In January, 1981, James sent an application for excess cover-

age for the second policy year to CMI. The application appeared to be a copy of the initial application, except that one or more of the exhibit pages are missing, and the application was unsigned. Subsequent correspondence reveals James asking CMI to review the application and to contact James to discuss it. A CMI worksheet dated January 29, 1981, covering many subjects ranging from exclusion endorsements to the reinsurance schedule, contained the entry that "brochures" were "not needed." Midland issued the second policy.

In early January, 1982, CMI advised James that the prior policy was about to expire and solicited a renewal of the policy. CMI subsequently requested a completed application and a five-year loss history containing aggregate and excess losses over $25,000. James responded by sending CMI a renewal application for the third policy. This application is missing from the record, but correspondence between James and CMI substantiates its contents. CMI and Midland both possessed at that time product brochures containing explicit references to Chesterton products containing asbestos. Midland issued the third policy.

During the year in which the third policy was in effect, Chesterton was named in at least three additional lawsuits in which plaintiffs alleged that bodily injuries resulted from the inhalation of asbestos fibers. As was the case with the earlier lawsuits, however, Chesterton was convinced that the alleged injuries were not attributable to any of Chesterton's products. Chesterton's outside counsel advised that one case would probably settle for as little as $2,000, should that amount be offered.

In January, 1982, Liberty Mutual adopted new industry-wide standards regarding coverage for manufacturers of products containing asbestos that, among other matters, involved a retrospective rating adjustment. At some point near this time, the reserves on the Illinois cases against Chesterton involving the exploding pump (which did not involve asbestos) were set by Liberty Mutual at $25,000 a claimant. Although Liberty Mutual previously had assured Chesterton that its underlying primary coverage would be renewed for the coming year, the company would agree only to renew Chesterton's policy for ninety days. As a consequence, Chesterton was forced to seek primary coverage from another carrier.

In January, 1983, CMI advised James that Chesterton's third policy with Midland would be expiring in February and requested "full underwriting information." James sent CMI an application, with supporting documentation, that was substantially similar to that provided in the prior three years. The CMI underwriting worksheet prepared with respect to Chesterton's application that year, significantly, contained less information than on any of the worksheets prepared for the prior three years. Midland issued the fourth policy.

In January, 1984, James filed an application for excess indemnity coverage for the policy year beginning on February 1, 1984. Accompanying that application was a letter disclosing the existence of a total of thirteen claims that had been asserted against Chesterton up until that time, alleging injuries from asbestos. James characterized these claims as "nuisance claims" and noted that Liberty Mutual had placed a "very, very small reserve" on the claims. Documents attached to the application reported that (a) one claim had been dismissed without any payment; (b) the four Ohio claims served on Chesterton in January, 1980, had been dismissed with payments totaling $7,463; (c) three were reserved for $5,000 each; (d) two were reserved for $10,000 each; (e) no reserves were set for five of the claims. Midland rejected Chesterton's application for that year.

Based on these facts, the judge reached the following conclusions of law. There were no misrepresentations associated with the Midland policies issued for the first, second, and third years. The judge reasoned that, even assuming that misrepresentations did exist, the Fund had not met its burden with respect to showing that any misrepresentations were intentional or that they increased the risk of loss to Midland. The judge concluded, however, that the fourth policy was obtained based on misrepresentations by Chesterton that increased the risk of loss, and therefore, that policy was void. The judge also concluded that Chesterton may not rely on the doctrine of laches to bar that result. Judgment entered declaring the judge's conclusions, and the rights of the parties in accordance with the judge's rulings of law on the Fund's motions for partial summary judgment, as follows.

The first, second, and third Midland policies provide cover-

age for all claims in which it is alleged that bodily injury occurred during the policy periods. The Fund's duty to indemnify or to defend under the policies, therefore, is not limited to those underlying claims against Chesterton in which it is alleged that inhalation of asbestos fibers occurred during the policy periods. The Fund has no obligations to make indemnity payments because of bodily injury claims against Chesterton until the limits of all indemnity coverages provided by solvent excess carriers applicable to such claims have been exhausted. Once it is established that duty to defend coverages on all other applicable excess policies issued by solvent carriers have been exhausted, the Fund is obligated to defend Chesterton, up to the limits of indemnity coverage, as to claims alleging bodily injury that occurred during the policy periods. Chesterton does not, however, have to establish that the "ultimate net loss" limits of other applicable policies have been exhausted in order for the Fund to have a duty to defend. The monetary limits of the Fund's obligations are (a) $299,999 for each asbestos-related bodily injury claim; and (b) $299,999 for legal fees and costs incurred in the defense of each claim.

Chesterton thereafter sought to amend the judgment to provide that reasonable settlements made in good faith between Chesterton and a solvent excess insurer sufficed to satisfy the exhaustion requirement, and that actual exhaustion of the monetary limits of all excess indemnity policies need not be shown before the Fund's obligations to indemnify and defend on the valid Midland policies. This motion was denied. Chesterton's appeal claims error in the judge's denial of its motion to amend, as well as in the judge's rulings with respect to misrepresentations concerning the fourth policy and the doctrine of laches. The Fund has cross-appealed, raising claims of error in the judge's rulings with respect to misrepresentations concerning the first three policies in the first three years, the proper trigger of coverage of the second and third policies, and the judge's ruling that Chesterton need not exhaust the "ultimate net loss" coverage of its excess policies before the Fund has any obligation to defend on the underlying claims against Chesterton.

3. We turn first to the contentions made by Chesterton and

the Fund on the laches and misrepresentation claims, examining them under the familiar principles that a reviewing court will not set aside a trial judge's findings of fact unless they are "clearly erroneous" but will independently review the judge's legal conclusions. See *Jancey* v. *School Comm. of Everett*, 427 Mass. 603, 605-606 (1998), citing *Kendall* v. *Selvaggio*, 413 Mass. 619, 620-621 (1992). Under G. L. c. 175, § 186, a misrepresentation in an application for insurance is material, and, thus, will enable the insurer to avoid the policy, if it is made with actual intent or if it increases the risk of loss. A material fact, measured by an objective standard, is one which would "naturally influence the judgment of [an] underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium." *Employers' Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 655 (1975), quoting *Daniels* v. *Hudson River Fire Ins. Co.*, 12 Cush. 416, 425 (1853). See *Northwestern Mut. Life Ins. Co.* v. *Iannacchino*, 950 F. Supp. 28, 31 (D. Mass. 1997) (facts are material where disclosure of truth would have influenced judgment of underwriter). The Fund has the burden of proof on this issue. See *Pahigian* v. *Manufacturers' Life Ins. Co.*, 349 Mass. 78, 85 (1965). We have reviewed the lengthy record with care and conclude that the judge's clear subsidiary findings concerning a complicated situation were justified by the evidence and amply support his conclusions that (a) no false statements or misrepresentations on the part of Chesterton were made in connection with its application to Midland for excess indemnity coverage for the first, second, and third policies; (b) misrepresentations were made in its application for coverage for the fourth policy; and (c) the doctrine of laches does not operate to bar the Fund from relief.

a. The Fund asserts that Chesterton made misrepresentations with respect to the first, second, and third policies, when it failed to disclose to Midland that it had been named in a number of asbestos-related lawsuits seeking millions of dollars in damages as a result of exposure to Chesterton's asbestos-containing products. According to the Fund, these misrepresentations were made with actual intent to deceive or, alternatively, that the misrepresentations increased Midland's risk of loss and, thus, were material. We do not agree.

The judge made a clear finding that CMI, or Midland, was aware of the nature of Chesterton's products, including the fact that several of its products contained asbestos. The Fund has not challenged this finding as erroneous, nor would any such challenge be successful. With respect to Question 17, which required Chesterton to report any case reserved for an amount in excess of $10,000, there was none so reserved prior to, or during, the application process for the first three policies. The standard application form was not created for a specific risk,[6] and, as the deposition testimony of one former CMI agent confirmed, served only as a starting point in CMI's underwriting process. The judge properly concluded that the Fund had failed to sustain its burden of demonstrating, pursuant to G. L. c. 175, § 186, that Chesterton made a misrepresentation that would allow the Fund to avoid Midland's obligations under the first, second, and third policies. This conclusion was correct and obviates any need to dwell on the Fund's arguments with respect to the question of intent[7] or the Fund's contention that the judge erroneously concluded that the omissions made on the applica-

---

[6]The application asked: "Are Radioactive Materials used or handled?"; "Does Applicant Operate an Industrial Railroad?"; "Does Applicant have any Storage of Explosives or Inflammables?"; and "Does Applicant operate a Hospital or First-aid facility?" but made no mention of asbestos.

[7]One point bearing on the question of intent, however, warrants mention. The record contains two memoranda, dated March 5, 1980, and October 22, 1982, from Richard Hoyle, who, at that time, handled all asbestos-related claims made against Chesterton, to Chesterton's insurance manager, Frank Boccelli. The memoranda were admitted in evidence at trial but not mentioned in the judge's findings. The first informs Boccelli that outside counsel had suggested that Chesterton put its insurance carriers, including its excess carriers, on notice of the Ohio lawsuits. The second reminds Boccelli of his responsibility to notify excess carriers of any future lawsuits against Chesterton "if there is any chance of exceeding the primary coverage." The Fund suggests that these letters demonstrate that, at least before the second and third policies issued, Chesterton knew that Midland should be informed of the lawsuits against it at that time and intentionally ignored its obligation to do so. We disagree. A fair reading of the memoranda permits at most an inference that Chesterton was closely monitoring the lawsuits against it and was taking steps to ensure that the company's primary and excess insurance coverage was sufficient to cover its future liability. The record supports a determination that Chesterton was a cautious company that would not have risked losing coverage of its excess indemnity policies by a purposeful failure to disclose material information. The record also fully supports the judge's determination that Chesterton sincerely believed that its products were safe and that it had been

tions did not have the effect of increasing Midland's risk of loss.[8]

b. No one factor led to the judge's determination that misrepresentations had been made with respect to the fourth policy. The judge was persuaded, however, by the "totality of the circumstances" that "an objective applicant for excess coverage [would] have provided the information regarding the increase in the number of asbestos related lawsuits to an insurer in an application."

By the time that Chesterton applied for the fourth policy (1) Liberty Mutual's primary coverage had been withdrawn due to that company's decision not to write policies for manufacturers of products containing asbestos; (2) Chesterton had been named in two lawsuits brought by three claimants alleging injuries that occurred when a Chesterton pump exploded; (3) Chesterton had been served as a defendant in nine additional asbestos-related lawsuits; and (4) Chesterton was concerned that it would have difficulty in obtaining insurance coverage at all levels due to its asbestos exposure.

The judge found that Chesterton knew, when it applied for coverage from Midland for the fourth policy year, that Liberty Mutual had reserved the Illinois lawsuits for an amount of $25,000 per claimant. Yet those lawsuits had not been listed in response to Question 17 on the application, which sought

---

misnamed in the asbestos-related claims against it.

[8]Contrary to the Fund's assertion, the judge did not base his conclusion with respect to risk of loss on Chesterton's subjective belief that it had been wrongfully sued. The judge's findings on this point (set forth in the event an appellate court might disagree with his analysis of the law) are clear. A former agent for CMI testified that Midland, at some point in time, began placing endorsements on certain policies excluding coverage for asbestos-related claims and, later, declined to write coverage for manufacturers of products containing asbestos. The agent was, however, unable to provide dates with any specificity. Based on his testimony that "whether we would have . . . excluded the asbestos or declined the risk would have depended on exactly what time and what other information we had," the judge found that Midland did not have a practice, in the relevant time period, of refusing to issue policies to companies that manufactured, or sold, products containing asbestos. CMI or Midland were in possession of brochures that described Chesterton's manufactured products containing asbestos, and could have sought further information on the subject. Instead, the judge noted, Midland continued to issue policies to Chesterton "at the same or higher limits for the same, or lower, premium charged before it had possession of the brochures."

enumeration of "all losses paid or now reserved in excess of $10,000 as respects accidents occurring during the past five years." In making this finding, the judge relied, in part, on a letter dated September 22, 1982, in which an insurance advisor communicated with Chesterton regarding the reserves of the above mentioned lawsuits. We reject Chesterton's claim that this letter constituted inadmissible hearsay. The letter was admitted in evidence at trial for the limited purpose of proving knowledge and notice, specifically, to demonstrate that Chesterton was, in fact, actively reviewing its reserves at that time and knew what reserves had been assigned the exploding pump claims. This is precisely the purpose for which the letter was used. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.2.2., at 466-467 (7th ed. 1999).

The judge's findings with respect to Question 25 are equally unassailable. In circumstances such as Chesterton found itself, any commonsense interpretation of that statement would appear to require, at the very least, a disclosure that it had been named as a defendant in lawsuits seeking millions of dollars in damages for personal injury due to exposure to asbestos. Chesterton's response to the same inquiry in its application for coverage for the following year, beginning February 1, 1984, indicates that it did, in fact, clearly understand the import of Question 25. We agree with the judge that the fourth application was inaccurate on its face.

We need not address the question of Chesterton's subjective intent, for the judge made clear his conviction, based primarily on his assessment of the credibility of Richard Hoyle, that Chesterton harbored no actual intent to deceive Midland. We agree with the judge, however, that Chesterton's failure to disclose the number of other pending lawsuits against it, or the fact that it had lost general commercial liability coverage from Liberty Mutual, increased Midland's risk of loss and, therefore, was "material" under G. L. c. 175, § 186. There can be little doubt that, had Midland been informed of the growing number of lawsuits against Chesterton, it would have demanded an asbestos exclusion from the policy coverage or, at the very least, have raised its premium. The most persuasive evidence of this fact is that, in January, 1984, when Chesterton did in fact

inform Midland of the existence of the asbestos lawsuits in its application for a policy for the next year, Midland refused to renew Chesterton's coverage.

c. Chesterton contends that it was denied the opportunity to litigate this matter when "memories were fresh and document files intact" and, therefore, the Fund's misrepresentation claim should be barred by the equitable doctrine of laches or unreasonable delay. We disagree. The operation of laches generally is a question of fact for the judge, and a judge's finding as to laches will not be overturned unless clearly erroneous. See *West Broadway Task Force* v. *Boston Hous. Auth.*, 414 Mass. 394, 400 (1993), citing *Tzitzon Realty Co.* v. *Mustonen*, 352 Mass. 648, 650 (1967). It is true that thirteen years passed between 1984, the time Midland was apprised of the facts forming the basis of the misrepresentation claim, and 1997, when the Fund asserted misrepresentation as an affirmative defense in its answer to Chesterton's amended complaint. "Laches is not mere delay, [however,] but delay that works disadvantage to another." *Calkins* v. *Wire Hardware Co.*, 267 Mass. 52, 69 (1929). On the record before us, Chesterton has failed to demonstrate that any delay was unjustified or unreasonable and that it had a prejudicial effect on its ability to defend against the misrepresentation claim with respect to the fourth policy. See *G.E.B.* v. *S.R.W.*, 422 Mass. 158, 166 (1996), quoting *Srebnick* v. *Lo-Law Transit Mgmt., Inc.*, 29 Mass. App. Ct. 45, 49 (1990). Within three days of receiving notice, in November, 1987, of Chesterton's asbestos-related claims under the Midland policy, the Fund responded by expressly reserving its rights as to whether the claims qualified as covered claims under G. L. c. 175D, and, if so, the amount of coverage available.[9] See *West Broadway Task Force* v. *Boston Hous. Auth., supra* at 400, cit-

---

[9]The above facts set this case distinctly apart from a case decided by a judge in the Court of Common Pleas of Ohio, *Owens-Corning Fiberglas Corp.* v. *American Centennial Ins. Co.*, 74 Ohio Misc. 2d 183 (1995), relied on by Chesterton. In that case, a judge concluded that the Ohio statute of limitations barred a claim seeking rescission or reformation, and that the doctrine of laches barred the affirmative defense of misrepresentation, asserted by an excess insurer against its insured, like Chesterton, a manufacturer of asbestos products. *Id.* at 200. In the Ohio case, the insured's underwriter testified that he knew of the alleged fraud during the policy period in 1979, but did nothing about it (except "keep the premiums which were paid and keep

ing *Elm Farm Foods Co.* v. *Cifrino*, 328 Mass. 549, 557 (1952) ("It is well established in the Commonwealth that laches does not operate to bar a claim simply because the events which established rights in the plaintiff occurred long ago"). While the memories of witnesses may have faded by the time the misrepresentation issues were litigated at trial, a substantial portion of the judge's evidentiary determinations were based on documents in the record. While Midland's liquidation, understandably, may have resulted in missing files, Chesterton's own documentation of its insurance coverage for that year should have been intact. Moreover, it is arguable that the missing application for the fourth policy year harmed the Fund as much as Chesterton. It was, after all, the Fund that bore the burden of proof on the issue of misrepresentation.

4. We next take up the trigger of coverage issue. " 'Trigger of coverage' is a term of art whereby the court describes what must occur during the policy period for potential coverage to commence under the specific terms of an insurance policy." *Rubenstein* v. *Royal Ins. Co.*, 44 Mass. App. Ct. 842, 850 n.6 (1998), *S.C.*, 429 Mass. 355 (1999). The interpretation of policy language is a question of law for the judge and for a reviewing court. We look to the policy as written; we neither "revise it or change the order of the words." *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 147 (1984). See *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. 422, 427-428 (1995). If in doubt, we "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993), quoting *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990).

Under the terms of the first policy, Midland promised to indemnify Chesterton "against such ultimate net loss in excess of [Chesterton's primary limit] as [Chesterton] sustains by reason of liability . . . for damages because of personal injury . . . caused by an occurrence anywhere in the world."

Under the terms of the second and third policies, Midland promised

quiet") until over one decade had passed. *Id.* at 201.

"[T]o pay on behalf [of Chesterton] such ultimate net loss in excess of [Chesterton's primary limit] as [Chesterton] sustains by reason of liability . . . for damages because of personal injury, property damage or advertising liability to which this policy applies, caused by an occurrence anywhere *during the policy period*" (emphasis added).

The remaining relevant terms of all three policies are, essentially, the same. Except for slight differences of no import, all define an "occurrence" as:

"[A]n accident, happening or event, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured. All such exposure arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

Under the terms of all three policies, coverage includes "bodily injury, including death at any time resulting therefrom," and, as explained above, the parties have stipulated that the bodily injury alleged in each underlying claim is deemed to begin at the time each claimant was first exposed to asbestos and to continue up until the time of diagnosis, death, or the filing of the underlying claim.

The Fund readily accepts that potential coverage under the first policy is triggered by a claim alleging that a claimant suffered bodily injury during the effective dates of the policy period, February 1, 1980, to February 1, 1981, so that the first policy covers any claim for bodily injury taking place within those dates, even if the event that caused it (inhalation of asbestos fibers) took place prior to the inception of the policy. The Fund claims, however, that the addition of the words "during the policy period" to the second and third policies must be interpreted to limit coverage under those policies to claims alleging inhalation of asbestos within the effective dates of those policies, February 1, 1981, to February 1, 1983. The judge concluded that the policy language in question, read in context, is ambiguous and so must be construed against the insurer and

in favor of an interpretation beneficial to the insured. See *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 281 (1997), quoting *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, *supra*. We discern no such ambiguity.

Were the language contained in the second and third policies with respect to coverage the same as that in the first policy, we would have no difficulty agreeing with the judge.[10] The language in question, however, is distinct from that in the first policy and compels a different conclusion. The words "during the policy period" immediately following the word "occurrence" (and not, for example, after the words "bodily injury") suggest only that it is an occurrence, and not bodily injury, that must take place during the policy period. A reasonable policyholder would understand the policy definition of an "occurrence," in the context of asbestos-related claims, to equate to exposure to, or inhalation of, asbestos (whether a one-time event or, more likely, continuing or repeated exposure), and not the bodily injury (here, beginning at the first exposure and continuing until diagnosis or death, or until a claim is made) that follows. Cf. *Ober* v. *National Cas. Co.*, 318 Mass. 27, 30 (1945).[11]

---

[10] Courts construing "occurrence" language similar to that contained in the first policy (covering bodily injury caused by "an occurrence anywhere in the world") consistently (and properly) have held that potential coverage is determined not by the time the wrongful act was committed, but the time when the claimant was actually damaged. See *Lumbermens Mut. Cas. Co.* v. *Belleville Indus., Inc.*, 407 Mass. 675, 686-687 n.9 (1990); *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 152 (1984). See also *Eagle-Picher Indus., Inc.* v. *Liberty Mut. Ins. Co.*, 682 F.2d 12, 17, 23-25 (1st Cir. 1982), cert. denied, 460 U.S. 1028 (1983) (interpreting Massachusetts law in asbestos exposure situation, holding that "each occurrence is made up of two components, the exposure and the resulting bodily injury; and it is the resulting bodily injury, not the exposure, which must take place 'during the policy period' ").

[11] Because the injurious effects of asbestos may not be apparent, or capable of medical diagnosis, for many years after initial exposure, the questions "what is bodily injury" and "when does it occur" often assume primary importance in insurance coverage disputes involving asbestos. See generally 1 B.R. Ostrager & T.R. Newman, Insurance Coverage Disputes § 9.03[a] & [b] (12th ed. 2004), and cases cited. See also Note, The Calculus of Insurer Liability in Asbestos-Related Disease Litigation: Manifestation + Injurious Exposure Continuous Trigger, 23 B.C. L. Rev. 1141, 1148 (1982); Comment, Liability Insurance for Insidious Disease: Who Picks Up the Tab?, 48 Fordham L. Rev. 657, 660 (1980). The parties' stipulation as to bodily injury resolves

In *Matter of the Liquidation of Midland Ins. Co.*, 164 Misc. 2d 363 (N.Y. Sup. Ct. 1994), a judge in the Supreme Court of New York County construed language in an excess umbrella liability policy, issued in 1975 by Midland, that provided coverage for asbestos-related injuries resulting from "accidents or occurrences happening between the effective and expiration dates" of the policy. See *id.* at 365. This policy language is effectively the same as that we interpret today. The judge stated, "No reading of the [policy] language can lead to the conclusion that coverage is to be triggered by '*bodily injury* during the policy period,' as in the numerous [commercial general liability] policy cases cited by [the claimant]. . . . No ambiguity exists . . . as to the need for the 'event', i.e., the 'exposure' to 'happen' during the policy period." *Id.* at 370. See *In re Liquidation of Midland Ins. Co.*, 269 A.D. 50, 71 (N.Y. 2000) (affirming lower court's declaration that trigger of policy coverage is first, or subsequent, exposure to asbestos). The judge reasoned that a trigger of exposure to, and inhalation of, asbestos during the policy period (even though in that case, as here, tantamount to bodily injury), differs significantly from a trigger of bodily injury occurring during the policy period. We think the judge's reasoning is sound. In the final analysis, it is the policy language that controls, and the language in this case is clear. We may not invent ambiguity where none exists. See *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998); *Lumbermens Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995). We conclude that the trigger event under the second and third Midland policies is the exposure, or inhalation, to asbestos, which results in the injury, and not the injury itself.

In perceiving ambiguity in the policy language, the judge relied in part on two Federal decisions addressing similar policy language in the context of asbestos-related cases. See *Stonewall Ins. Co.* v. *Asbestos Claims Mgt. Corp.*, 73 F.3d 1178, 1192 n.5 (2d Cir. 1995) (*Stonewall*), and *Eagle-Picher Indus., Inc.* v. *Liberty Mut. Ins. Co.*, 682 F.2d 12, 24 (1st Cir. 1982), cert. denied, 460 U.S. 1028 (1983) (*Eagle-Picher*). Those cases are

those questions for purposes of this case. Under the stipulation, a claimant who demonstrates exposure to asbestos during the policy period has, by necessity, demonstrated bodily injury occurring at the same time.

distinguishable. In *Stonewall,* the insurer itself had interpreted its policy language, "personal injury . . . caused by or arising out of an occurrence which takes place during the policy period anywhere in the world," to require only that injury need occur during the policy period. *Id.* The question of construction we face here, therefore, was never at issue in that case.

The *Eagle-Picher* case warrants further discussion. There, the United States Court of Appeals for the First Circuit examined words defining coverage under an American Motorists policy — "personal injury caused by . . . an occurrence which takes place during the policy period" — found them to be ambiguous, and, ultimately, construed the policy to require only that bodily injury occur during the effective period. See note 10, *supra.* The American Motorists policy, however, defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results, *during the policy period,* in bodily injury" (emphasis added). It was this additional temporal language (not present in this case) that initially suggested ambiguity to the court. See *Eagle-Picher, supra* at 17, 23-24. Further, the *Eagle-Picher* court was called to resolve, apparently for the first time in the First Circuit, difficult issues not present in this case, regarding the nature of bodily injury in the progressive disease context. See *id.* at 24 (holding that asbestos-related disease becomes manifest at time disease is reasonably capable of medical diagnosis). A final distinction of note is that Eagle-Picher (unlike Chesterton) was uninsured during most of the time that it manufactured asbestos products. The court recognized that the construction favored by American Motorists (and here argued by the Fund) would severely limit the company's available coverage and resolved its doubts for the benefit of Eagle-Picher. We are not inclined to follow the construction adopted by the court in *Eagle-Picher* in plainly different circumstances. We conclude that the trigger event under the second and third Midland policies is the exposure to, or inhalation of, asbestos, which results in the injury, and not the injury itself. The continuing progression of the asbestos-related disease, without some initial, or subsequent, exposure to

asbestos during the effective dates of those policies, will not trigger coverage under the second and third Midland policies.[12]

5. We now turn to the exhaustion issue as it relates to the duty to indemnify. Both Chesterton and the Fund accept that G. L. c. 175D requires the exhaustion of joint and severally solvent policies before a policyholder may submit a "covered claim" to the Fund. They disagree, however, on whether a policyholder must exhaust the limits of all applicable solvent excess policies before the Fund's duty, pursuant to G. L. c. 175D, § 5, to indemnify with respect to "covered claims" arises.[13] This was the primary issue at oral argument, the Fund contending that "exhaustion" requires the recovery of the full limits of all available excess solvent policies, and Chesterton contending that exhaustion can also be accomplished by a lesser

[12]We reject Chesterton's so-called "exposure-in-residence" theory, which postulates that the presence of asbestos fibers in the lungs equates to continued and repeated exposure to asbestos under the Midland policy language. It is undoubtedly true that asbestos fibers, once inhaled, remain in the lungs and cause a slowly progressing disease that may not be capable of diagnosis for years. The leading case for that proposition is *Keene Corp.* v. *Insurance Co. of N. Am.*, 667 F.2d 1034, 1042 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982). All four insurers in the *Keene* case had provided coverage at various points in time when inhalation actually occurred, but the insurers disagreed as to whether coverage should be triggered by exposure to asbestos or by the manifestation of the asbestos-related disease. In order to protect policyholders from future claims arising out of past exposure, the *Keene* court held that coverage would be triggered by manifestation of the disease, as well as by exposure. See *id.* at 1045-1046. The court's "continuous trigger" approach, which defines bodily injury as occurring continually during "any part of the single injurious process that asbestos-related diseases entail," *id.* at 1047, mirrors that stipulated to by the parties in this case. Because the continuing progression of the disease is not enough to trigger the second or third Midland policies, however, claimants who were not exposed to asbestos during their effective dates will not be covered under those policies.

[13]The court solicited amicus briefs on this question, and we now acknowledge briefs submitted by the Complex Insurance Claims Litigation Association and by the Boston Gas Company and the Massachusetts Electric Company. It came to this court's attention that an amicus brief submitted by Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies was authored, at least in part, by certain London insurers who had been parties to this litigation, and still may be in settlement discussions with Chesterton on other policy issues. Their brief presents arguments concerning the merits of a "pro rata" method of allocation, arguments that the London insurers have already presented to the judges in connection with this case. We do not consider their brief.

recovery pursuant to a good faith settlement. We conclude that where a policyholder chooses to enter into a settlement agreement with a solvent carrier for less than the policy's stated limits, that settlement, even though made in good faith, does not exhaust the policy for purposes of G. L. c. 175D. This conclusion is consistent with the Legislative purpose behind the Fund, its clear statutory design, and with case law interpreting G. L. c. 175D.

The Fund was created to benefit the public by ensuring that all holders of policies covered by the Fund will be paid for losses incurred. See *Massachusetts Motor Vehicle Reinsurance Facility* v. *Commissioner of Ins.*, 379 Mass. 527, 534-535 (1980). It was intended to be a source of last resort, to avoid financial loss to claimants and to policyholders in the event of the insolvency of an insurer. See *Vokey* v. *Massachusetts Insurers Insolvency Fund*, 381 Mass. 386, 390 (1980) (interpreting requirement in G. L. c. 175D, § 9, of exhaustion of insolvency provisions of other policies before claim made to Fund). We have stated that the statute clearly does not preclude recovery from the Fund where other solvent insurers exist, see *Norfolk & Dedham Mut. Fire Ins. Co.* v. *Quane*, 442 Mass. 704, 709-711 (2004), but, just as clearly, the statute does not contemplate that the Fund's liability is coextensive with the obligations of those solvent insurers.

The statutory scheme discloses a primary legislative intent that the Fund serve only claimants of insolvent insurers who have no other source of recovery beyond the Fund. The Fund's principal obligation is to pay the "covered claims" of insolvent insurers. See G. L. c. 175D, § 5 (1). Section 1 (2) defines a "covered claim" as an "unpaid claim," subject to certain limitations, made pursuant to a policy issued by an insurer that has become insolvent, and excluding claims asserted by "a reinsurer, insurer, insurance pool or underwriting association." G. L. c. 175D, § 1 (2). See *Norfolk & Dedham Mut. Fire Ins. Co.* v. *Quane*, *supra* at 704-705 n.2. To the extent that compensation remains available from another source, such as other excess indemnity policies whose limits have not yet been reached, a claim is not "unpaid."

By settling with solvent insurers for less than their full policy

limits, Chesterton has, in effect, absolved those insurers of amounts they otherwise would owe and now seeks to impose such amounts on the Fund. Because member insurance companies pay into the Fund, and then recoup payments in the rates and premiums charged for insurance policies, it is the public that ultimately will bear financial responsibility for such settlements. A company that settles with its solvent excess insurers for less than the policy limits should, in fairness, bear the risk of settling too conservatively. We conclude that where a company fails to exhaust the limits of its solvent excess coverage before turning to the Fund, the Fund will be entitled to a credit, against any liability of the Fund to indemnity or defend, in an amount equal to the full limit of the solvent excess policies.

This position mirrors, essentially, one taken by a substantial number of State appellate courts that have considered this issue interpreting exhaustion language of their respective insurance guarantee fund statutes in the context of uninsured motorist policy limits. See, e.g., *Hasemann* v. *White*, 177 Ill. 2d 414, 420 (1997) (reasoning that limiting Illinois Insurance Guaranty Fund's setoff to amount actually received under settlement would "invite collusion and provide little incentive for a claimant to pursue a full and fair settlement with his own carrier"); *California Ins. Guar. Ass'n* v. *Liemsakul*, 193 Cal. App. 3d 433, 440 (1987); *Colorado Ins. Guar. Ass'n* v. *Harris*, 827 P.2d 1139, 1142 (Colo. 1992); *Robinson* v. *Gailno*, 275 Conn. 290, 306 (2005); *Hetzel* v. *Clarkin*, 244 Kan. 698, 706 (1989); *Kenny* v. *Hoschar*, 675 So. 2d 807, 810 (La. Ct. App. 1996); *Belongia* v. *Wisconsin Ins. Sec. Fund*, 195 Wis. 2d 835, 849 (1995).[14] See also *Jackson Brook Inst., Inc.* v. *Maine Ins. Guar. Ass'n*, 861 A.2d 652, 656-657 (Me. 2004) (holding that settlement for less than uninsured motorist policy limits precludes claim on Maine Insurance Guaranty Association); *Prutzman* v. *Armstrong*, 90 Wash. 2d 118, 122 (1978) (settlement for less than policy limits

---

[14]We reject Chesterton's argument that slight differences in the language of the Post-Assessment Property and Liability Insurance Guaranty Model Act (Model Act), from which G. L. c. 175D derives, see *Vokey* v. *Massachusetts Insurers Insolvency Fund*, 381 Mass. 386, 390 (1980), and § 9 of our statute, compel a different result.

not exhaustion within meaning of Washington's guaranty statute).

We need not address whether the limits of a particular excess coverage have, in this case, been exhausted. Resolution of that factual issue must wait until such time as Chesterton contends to the Fund that the limits of all its excess carriers have been exhausted. The legal framework applicable to that issue, including statutory requirement, has been thoroughly addressed herein.

6. Finally, we address the exhaustion issue as it relates to duty to defend coverage. Each of the valid Midland policies contains a provision stating:

> "If no other insurer has the right and duty to do so, [Midland] shall have the right and duty to defend any suit against [Chesterton] seeking damages on account of . . . personal injury . . . but [Midland] shall not be obligated to defend any suit after [its] liability has been exhausted . . . ."

Chesterton and the Fund agree that, if any solvent insurer has a duty to defend, then that defense obligation must be exhausted before reference is made to the Fund. Their positions differ, however, on whether Chesterton must also exhaust the indemnity limits of all solvent insurance coverage — including payments for defense costs up to the "ultimate net loss" — before the Fund is obligated to defend. The Fund argues that there is, essentially, no distinction between another insurer's duty to defend and its obligation to indemnify for defense costs up to the "ultimate net loss" limit of its policy.[15] The Fund may not be called to defend Chesterton, therefore, until other solvent excess insurers have paid for Chesterton's defense costs up to the "ultimate net loss" limit of their respective policies. Nothing in G. L. c. 175D requires that result.

As has been discussed, the Fund was created as a safety net for the protection of claimants and policyholders in the event of the insolvency of an insurer. See *Vokey* v. *Massachusetts*

---

[15]Excess insurance policies generally provide indemnification coverage for "ultimate net loss." The Midland policies define "ultimate net loss" as "the total sum which the Insured, or any company as his insurer, or both, become obligated to pay as damages . . . because of personal injury or property damage."

*Insurers Insolvency Fund, supra*; *Massachusetts Motor Vehicle Reinsurance Facility* v. *Commissioner of Ins., supra*. It is consistent with the plain language of G. L. c. 175D, § 5 (1), and with the Fund's broad purpose, as discussed above, that it be obligated to provide a defense to any claim brought against Chesterton to the same extent as Midland, had that company not become insolvent. The Fund's obligation to defend Chesterton is set forth in the Midland policy language and arises if "no other insurer has the right and duty to do so."

It is settled that an insurer's duty to defend is independent from, and broader than, its duty to indemnify. See *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 394 (2003); *Bagley* v. *Monticello Ins. Co.*, 430 Mass. 454, 458-459 (1999); *Boston Symphony Orch., Inc.* v. *Commercial Union Ins. Co.*, 406 Mass. 7, 10-11 (1989). The Fund's obligation to defend, therefore, cannot be treated as secondary to other insurers' obligations to make payments for indemnity obligations, and costs of defense, as part of its "ultimate net loss" coverage. Were the Fund to prevail on the position it urges, Chesterton would bear the loss, as payments by other insurers for defense costs would reduce the amount of "ultimate net loss" coverage otherwise available to indemnify Chesterton for its liability on the underlying claims asserted against it. We conclude that the Fund's duty to defend claims against Chesterton is not set in motion unless Chesterton establishes that no solvent insurer has a duty to defend under other available policies, but that Chesterton is not required, as a precondition to the Fund's duty to defend, to demonstrate exhaustion of any or all "ultimate net loss" coverages within those policies.

7. The order denying Chesterton's motion to amend is affirmed. The third paragraph of the judgment of the Superior Court is modified by striking the first sentence and adding to it a provision declaring that the Midland policy for the period from February 1, 1980, until February 1, 1981, provides coverage, subject to the terms and conditions of that policy and the provisions of G. L. c. 175D, for all claims in which there was bodily injury during that policy period, and that the Midland policies for the periods February 1, 1981, until February 1, 1982, and February 1, 1982, until February 1, 1983, provide

coverage, subject to the terms and conditions of those policies and the provisions of G. L. c. 175D, for all claims in which there was exposure to asbestos during one or both of those policy periods. With this modification, the judgment is affirmed.

*So ordered.*